Donald M. **PETERSON**, D. O., Plaintiff,

v.

Elliott L. **RICHARDSON**, Secretary of Health, Education and Welfare, et al., Defendants,

v.

James E. **PETERSON**, Third Party Defendant.

Civ. A. No. CA–3–5158.

United States District Court, N. D. Texas, Dallas Division.

Oct. 29, 1973.

Glynn A. Pugh, Dallas, Tex., for plaintiff.

Kenneth J. Mighell, Dallas, Tex., for defendants.

Jerry N. Jordan, Joseph A. Jenkins, Dallas, Tex., for third party defendant.

## MEMORANDUM OPINION

ROBERT M. HILL, District Judge.

Dr. Donald M. Peterson filed this action against the Department of Health, Education and Welfare (hereinafter "HEW") and certain government officials and insurance carriers who administer the Medicare Act. He seeks injunctive relief reinstating him as a participating physician under the medicare programs and the recovery of certain sums which have been withheld from him under the medicare programs. He also seeks compensatory and punitive damages against individual defendants for suspending his medicare payments. Defendant United States of America filed a counterclaim against Dr. Peterson and a third party complaint against his brother, James E. Peterson, alleging that they made and presented, or caused to be made and presented, false, fictitious and fraudulent claims for payment of medical treatment and services ren-

dered to medicare beneficiaries. This counterclaim and the third party complaint were brought pursuant to the False Claims Act, 31 U.S.C. § 231.[1]

## Dr. Peterson's Suspension

Dr. Peterson is a licensed physician of osteopathy practicing in the City of Dallas. A large portion of his practice is devoted to the care and treatment of patients eligible to receive medicare benefits. In June of 1969 a complaint relating to Dr. Peterson was received by the Bureau of Health Insurance (hereinafter "BHI"), a department of HEW. Defendants James A. Adams (hereinafter "Adams"), Donald Paul Chancellor (hereinafter "Chancellor") and Carl Gruninger (hereinafter "Gruninger"), employees of HEW, then commenced an investigation of certain claims for medicare payments submitted in April of 1969 for services rendered by Dr. Peterson in the spring of 1968. During this investigation defendant Martha A. McSteen (hereinafter "McSteen") was the regional representative of the BHI and in that capacity she supervised the investigation.

In December of 1969 it was determined from this investigation that 123 fraudulent claims had been presented to defendants Blue Cross-Blue Shield of Texas (hereinafter "Blue Cross-Blue Shield"), Group Hospital Service, Inc. (hereinafter "Group Hospital"), and Group Medical and Surgical Service (hereinafter "Group Medical"), all of whom are insurance carriers and fiscal intermediaries disbursing medicare and medicaid funds solely at the direction of BHI. This determination was based on HEW's finding that the medical treatment described in the claims was not rendered or personally directed by Dr. Peterson. As a result of this determination, Gruninger made the decision to suspend all medicare and medicaid payments to Dr. Peterson. This action was taken pursuant to BHI regulations and also in accordance with the General Accounting Office Policy and Procedures Manual for Guidance of Federal Agencies.

Further investigation continued until October 6, 1971, when the matter was referred to the United States Attorney for criminal prosecution. On September 8, 1972, an indictment was returned by the grand jury charging Dr. Peterson and James E. Peterson with submitting false claims under the medicare program. Following a trial, James E. Peterson was found guilty on thirty-nine counts of submitting false claims and Dr. Peterson was found guilty on one count of conspiracy to defraud the United States. These convictions are now on appeal.

On October 28, 1971, this court issued a preliminary injunction directing HEW to rescind the suspension of Dr. Peterson as a participating physician in the medicare and medicaid programs and to direct its intermediaries to process and to pay all claims submitted by Dr. Peterson for his services under these programs.

## I. Dr. Peterson's Complaint

Dr. Peterson urges three causes of actions. First, he seeks a money judgment for breach of contract since the defendants withheld some $90,000 for services which he had rendered under the medicare program. He claims that this

---

1. Revelant portions of this Act are:
    "Any person . . . who shall make or cause to be made, or present or cause to be presented, for payment or approval . . . any claim upon or against the Government of the United States . . . knowing such claim to be false, fictitious or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry . . . shall forfeit and pay to the United States the sum of $2,000, and in addition, double the amount of damages which the United States may have sustained by reason of the doing, or committing such act . . . . ."

was a malicious breach of contract, which under Texas law entitles him to tort damages and punitive damages. Second he alleges some seven different torts, all of which involve alleged maliciousness on the part of the individual defendants in suspending him from the medicare program and in withholding payments for services actually rendered under the medicare programs.[2] Finally, he seeks a permanent injunction directing HEW to reinstate him as a participating physician under the medicare and medicaid programs and to refrain from ever again suspending him unless in compliance with the laws of the United States. This court is of the opinion that none of Dr. Peterson's causes of action are meritorious.

## A. Breach of Contract and Tort Causes of Action

■ This court is of the opinion that Dr. Peterson's first and second causes of action are without legal merit. Defendants McSteen, Adams, Gruninger and Chancellor are clearly immune from any liability under the doctrine of official immunity announced in Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). In Barr, the Court held that the Acting Director of the Office of Rent Stabilization was immune from the libel laws of the District of Columbia for statements made within the scope of his employment, notwithstanding the fact that he acted with a malicious motive. The Court reasoned that it is "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." 360 U.S. at 571–572, 79 S.Ct. at 1340. There has been no showing that the actions of defendants McSteen, Adams, Gruninger and Chancellor were outside the scope of the statutes, regulations and instructions in force at the time. The trial testimony indicates that these defendants were acting within the scope of their employment and pursuant to the directions of HEW to discover fraud in the submission of claims under the Medicare Act. No liability can be imposed on these individual defendants pursuant to Dr. Peterson's cause of actions since these defendants have acted solely in their official capacities.

■ The defendants Blue Cross-Blue Shield, Group Hospital and Group Medical are also immune from any liability pursuant to Dr. Peterson's first and second causes of action. These defendants are insurance carriers who administer the medicare and medicaid programs at the direction of HEW pursuant to the provisions of 42 U.S.C. §§ 1395h and 1395u. Regulations established pursuant to these statutes provide that:

> "In the performance of their contractual undertakings, the carriers act on behalf of the Secretary, carrying on for him the administrative responsibilities imposed by the law. The Secretary, however, is the real party in interest in the administration of the program . . . ." 20 C.F.R. § 405.670 (1973).

It is clear from these provisions and regulations that these carriers are agents of the United States. Since the evidence shows that they were acting within the scope of their agency relationship with HEW and in accordance with the applicable statutes, regulations and directives of HEW, any liability would be that of the United States. Johnson v. Johnson, 332 F.Supp. 510 (E.D.Pa.1971); Kuenstler v. Occidental Life Insurance Co., 292 F.Supp. 532 (C.D.Cal.1968).

---

2. The seven alleged torts are as follows: (1) invasion of, or interference with, property rights; (2) taking of property without due process of law; (3) maliciously inducing Blue Cross-Blue Shield and Travelers Insurance Company to breach their contract with Dr. Peterson; (4) extortion by "cruel devices" with deliberate intent to create mental anguish and physical injury; (5) malicious conspiracy to punish without just cause; (6) malicious breaches of contracts by Blue Cross-Blue Shield of Texas and Travelers Insurance Company; (7) interference with contract rights.

■ This court cannot find any basis in this case to impose tort liability on the United States for the conduct of its employees and the actions of HEW agents in suspending Dr. Peterson as a participating physician and in withholding the processing of all other payments to him when the fraudulent claims were discovered. This conduct was neither malicious nor unreasonable. HEW had the right to withhold Dr. Peterson's medicare payments under 31 U.S.C. § 227 as an offset for any final judgment rendered against him under the False Claims Act. In view of the determination, *infra,* that Dr. Peterson did cause to be made a false claim, this court can find no tortious conduct on behalf of the United States, its employees and its agents. The court is also of the opinion that any liability for breach of contract was vitiated by the fraudulent conduct of Dr. Peterson as determined *infra.* Additionally, Dr. Peterson's claims against the United States for interference with contract rights and malicious prosecution are clearly barred by the terms of the Federal Tort Claims Act, 28 U.S.C. § 2680(h).

B. *Cause of Action for Injunctive Relief*

■ Dr. Peterson alleges that he was denied procedural due process when HEW withheld his medicare payments and suspended him as a participating physician during the investigation of the fraudulent claims. This allegation is without merit. As the Supreme Court stated in Hannah v. Larche, " 'Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts." 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960). This court is of the opinion that within the "factual contexts" of this case, Dr. Peterson was afforded procedural due process.

Dr. Peterson and his attorney met in defendant Gruninger's office on June 18, 1970, for about two hours. After he was given the *Miranda* warnings, Dr. Peterson was informed that his medicare payments were being withheld pending the investigation of possible fraudulent claims which had already been paid. He was also advised that there was no dispute as to the validity of the claims being withheld from payment, but that they were being withheld as an offset against any potential liability to the government. 31 U.S.C. § 227. During this conference, Gruninger outlined the reasons why HEW had reached the conclusion that the medicare claims in question were fraudulent and he cited specific instances. The conference was terminated with an agreement that HEW would write a letter outlining the allegations of fraud and that Dr. Peterson would then write a reply letter of explanation. Following the exchange of these letters, HEW rejected Dr. Peterson's contention that the medicare services covered by the disputed claims were rendered under his personal direction and thus were not fraudulent.

The decision to suspend Dr. Peterson and to withhold his medicare payments was in response to the determination by HEW that he had not rendered or personally directed the treatment described in the 123 claims. To require HEW to hold any additional hearings on the suspension of Dr. Peterson and the withholding of payments would necessitate a determination by HEW on the merits of the fraudulent medicare payments, a determination which was properly reserved for the courts in the subsequent criminal prosecution and civil litigation where the full "panoply" of judicial procedures were available to Dr. Peterson. Therefore, under these circumstances,[3] the proceedings afforded Dr. Peterson by HEW were consistent with the constitu-

3. "[W]hen a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used." Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960).

tional dictates of procedural due process.[4]

Additionally, any injury to Dr. Peterson was rectified when this court issued the preliminary injunction on October 28, 1971. As a result of this court's determinations, *infra*, this court is of the opinion that the preliminary injunction in favor of Dr. Peterson should be dissolved and that his request for permanent injunctive relief should be denied.

## II. *The Counter Claim and Third-Party Complaint*

In response to the original complaint, the United States has asserted a counterclaim against Dr. Peterson and a third-party complaint against James E. Peterson pursuant to the False Claims Act, 31 U.S.C. § 231 et seq. It is alleged that they made and presented, or caused to be made and presented, false claims for payment of medical treatment and services purportedly rendered to medicare beneficiaries.

### A. *James E. Peterson*

James E. Peterson was the principal owner and director of Concord Manor Nursing Home (hereinafter "Concord"); he was also the president and owner of Zodiac Enterprises, Inc. (hereinafter "Zodiac"), a subsidiary of Concord, which provided the services of registered physical therapists and physical therapy aids for nursing homes. Until March 1, 1969, Concord was certified to be reimbursed under Part A of the Medicare Act for in-hospital expenses and services (including physical therapy) rendered by Concord on behalf of medicare beneficiaries. Payments for these expenses and services come exclusively from a federal trust fund. Concord was never eligible to receive payments for Part B expenses which relate to physician services. On March 1, 1969,

Concord and James E. Peterson were notified by a medicare carrier that due to Concord's failure to file cost reports, payments for physical therapy treatment rendered under Part A would be suspended.

During the month of April 1969, Group Medical received 123 "Request for Payment-Medical Insurance Benefits" claims under Part B. These claims were for physical therapy actually rendered a year earlier by Zodiac to patients at Concord. All but eight of these claims bore a signature purporting to be that of Dr. Peterson certifying that the physical treatment was rendered personally by him or under his personal direction. Additionally, all 123 claims bore the "physician code" number assigned to Dr. Peterson. Representatives of Group Hospital testified that Dr. Peterson's purported signature certifying that treatment described in each claim had been rendered by him or under his personal direction was a material statement upon which they relied in approving the payment of the 123 claims. Consequently, Dr. Peterson received medicare checks for each claim, totaling $16,153.44. These checks were deposited by Dr. Peterson in his bank account. He then wrote and delivered a check to Zodiac covering the deposit. It is the contention of the government that these 123 claims were actually submitted by James E. Peterson and were false and fraudulent claims since Dr. Peterson did not personally render or personally direct the treatment described in the 123 claims.

It is undisputed that Dr. Peterson did not sign these claims. Lucille Morton, an employee of Zodiac and Concord, who was charged with the responsibility of preparing claims for medicare payments, testified that she signed Dr. Peterson's name and physician code number to the disputed claims at the direction of James E. Peterson. James E. Peterson

---

4. Administrative procedures for resolving any dispute Dr. Peterson may have had with the *carriers* were available pursuant to the provisions of 20 C.F.R. 405.801. There is no evidence that Dr. Peterson or his attorney ever attempted to invoke these procedures for an administrative review.

testified that he never directed Lucille Morton to sign his brother's name on the claims, however, he could offer no reasonable explanation as to why Lucille Morton would submit these claims bearing Dr. Peterson's signature and physician code number.

It is clear from the evidence that only James E. Peterson could benefit from his brother's signature on these claims. Since Concord was suspended from receiving any payments under the medicare programs the only way it could be paid for the treatment rendered before suspension, would be to submit claims under Part B. Part B, unlike Part A, requires a certification that the treatment was rendered by or under the personal direction of a physician. James E. Peterson was well aware of this requirement as demonstrated by a chart he personally prepared and introduced into evidence showing that Part B was "billable by physicians only." Further, Dr. Peterson testified that when he received the medicare checks, James E. Peterson requested that the proceeds be sent to Zodiac since the treatment was rendered by Zodiac. This court thereby finds that James E. Peterson knew that the claims required a physician's certification and that James E. Peterson instructed Lucille Morton to sign Dr. Peterson's name to these claims. This court concludes that James E. Peterson violated the False Claims Act by submitting the 123 claims.

■ James E. Peterson urges that these claims were not false since the treatment was actually rendered under the "personal direction" of Dr. Peterson in his capacity as medical director of Zodiac. Dr. Peterson and James E. Peterson testified that Dr. Peterson was the medical director of Zodiac. However, Helen Maeker, the only registered physical therapist for Zodiac, testified that she did not know that Dr. Peterson was the medical director. She also testified that he never gave her any directions in regard to the administration of physical therapy, nor was he present when she rendered any physical therapy in connection with these claims. She was never told to consult with Dr. Peterson with regard to any problems that may be encountered in performing physical therapy. The only contacts she had with Dr. Peterson were through his patients at Concord.

Helen Mathis, the director of nursing at Concord, also testified that she did not know that Dr. Peterson was medical director, nor did she ever see him supervise the administration of physical therapy at Concord. Lucille Morton, secretary-bookkeeper for Zodiac, did not know that Dr. Peterson was the medical director of Zodiac, nor was he ever compensated as a medical director of Zodiac. Weighing the testimony of these witnesses, this court finds that Dr. Peterson was not the medical director of Zodiac. Assuming however, that he was the medical director of Zodiac, the court finds that Dr. Peterson neither directed nor supervised the administration of the treatment described in the 123 claims submitted by James E. Peterson. Thus, these services were not services of a physician payable under Part B of the Medicare Act. This court finds that the 123 claims submitted by James E. Peterson were false and that he knew that they were false.

### B. *Dr. Peterson*

■ ■ In response to the 123 claims submitted by James E. Peterson and in reliance of the purported certification that the treatment was rendered by Dr. Peterson or under his personal direction, Group Medical issued checks totaling $16,153.44 to Dr. Peterson as payee. These checks were deposited by Dr. Peterson with the knowledge that he had rendered no services related to these checks. The proceeds of these checks were then delivered to Zodiac. This court concludes that the act of Dr. Peterson in endorsing these checks and depositing them for collection with the knowledge that he was not entitled to the proceeds of the checks constitutes the making of a false claim as to each

check. 31 U.S.C. § 231. United States v. Branker, 395 F.2d 881 (2d Cir. 1968); United States v. Scolnick, 219 F.Supp. 408 (D.Mass.1963). Further, the acts of Dr. Peterson, in combination with those of James E. Peterson, aided James E. Peterson in obtaining the funds paid on these false claims. The conclusion is inescapable that Dr. Peterson knew he was aiding James E. Peterson in obtaining payments on these false claims. Thus, Dr. Peterson is liable to the government on each claim under the provisions of 31 U.S.C. § 231.

### III. *Conclusion*

From the foregoing, this court concludes that Dr. Peterson and James E. Peterson have violated the provisions of the False Claims Act and that the United States is entitled to recover from Dr. Peterson and James E. Peterson the sum of $16,153.44, plus damages pursuant to the provisions of 31 U.S.C. § 231. Additionally, Dr. Peterson is not entitled to injunctive relief, tort damages or breach of contract damages against the defendants in this cause. Counsel for the government is directed to submit an order consistent with this opinion.

### JUDGMENT

On June 18, 1973, this cause came on for trial before the court and having heard the evidence and the argument of counsel, the court is of the opinion that judgment should be entered in accordance with its Memorandum Opinion which was filed on September 5, 1973. In that Memorandum Opinion the court found that plaintiff Donald M. Peterson was not entitled to injunctive relief, tort damages or breach of contract damages against any of the defendants. The court further found that third party defendant James E. Peterson knowingly submitted 120 false claims for Medicare payments to the United States of America in violation of the False Claims Act, 31 U.S.C. § 231, and that Donald M. Peterson knowingly cashed checks in payment of such false claims and thereby aided James E. Peterson in submitting the 120 false claims in violation of the False Claims Act.

The language of the False Claims Act provides that "any person . . . [who shall commit any of the acts prohibited] . . . shall forfeit and pay . . . the sum of $2,000, and, in addition, double . . . damages." This statute has been interpreted as permitting the imposition of a separate forfeiture for each separate violation of the statute. United States v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L. Ed. 443 (1942); Faulk v. United States, 198 F.2d 169 (5th Cir. 1952); United States v. Ueber, 299 F.2d 310 (6th Cir. 1962). The purpose of the $2,000 forfeiture provision is to reasonably indemnify the government for all losses arising from the false claims. The forfeiture was meant by Congress to reflect a fair ratio to damages in order to make sure the government would be made completely whole. United States v. Hess, *supra*; Toepleman v. United States, 263 F.2d 697 (4th Cir. 1959); United States v. Beatrice Foods Co., 330 F.Supp. 577 (N.D. Utah 1971).

Having considered all the evidence in this case and the efforts which the government has made in prosecuting these false claims, this court is of the opinion that the assessment of a $2,000 forfeiture for 120 false claims would be unreasonable and not remotely related to both the actual losses and inexplicable damages incurred by the government. This court concludes that the assessment of a $2,000 forfeiture for 50 of the false claims plus double damages for all 120 of the false claims would reasonably indemnify and make the government whole for the false claims made by James E. Peterson and Donald M. Peterson. The court is further of the opinion that interest should not be allowed on the money judgment but should be calculated from the date of entry of this judgment, at a rate allowed by state law. United States v. Foster Wheeler Corp., 447 F.2d 100 (2d Cir. 1971); United States v. Globe Re-

modeling Co., 196 F.Supp. 652 (D.Vt. 1961).

It is therefore ordered that plaintiff Donald M. Peterson take nothing by his action against all defendants and that his complaint be in all things dismissed; and,

It is further ordered that the United States of America recover of and from Donald M. Peterson and James E. Peterson, jointly and severally, the sum of $31,606.72, representing double damages for the 120 false claims in question; and,

It is further ordered that the United States of America recover of and from Donald M. Peterson and James E. Peterson, jointly and severally, the sum of $100,000 representing a $2,000 forfeiture for 50 of the 120 false claims in question; and,

It is further ordered that interest shall be recoverable on all amounts awarded from the date of this judgment at the rate allowed by Texas law; and,

It is further ordered that the preliminary injunction heretofore issued in this cause is dissolved and of no further force and effect.