Donald M. PETERSON,
Plaintiff-Appellant,

v.

Caspar W. WEINBERGER, Secretary of Health, Education and Welfare, et al., Defendants-Third-Party Plaintiffs-Appellees,

v.

James E. PETERSON, Third-Party Defendant-Appellant.

No. 74–1067.

United States Court of Appeals, Fifth Circuit.

Feb. 14, 1975.

Rehearing and Rehearing en Banc Denied March 27, 1975.

Glynn A. Pugh, Dallas, Tex., for Donald Peterson.

Joseph A. Jenkins, James W. DeMik, Jerry Jordan, Dallas, Tex., for J. E. Peterson.

Frank D. McGown, U. S. Atty., Ft. Worth, Tex., Kenneth J. Mighell, Asst. U. S. Atty., Dallas, Tex., for U.S.A.

Before DYER, SIMPSON and CLARK, Circuit Judges.

DYER, Circuit Judge:

James E. Peterson and his brother, Dr. Donald M. Peterson, appeal from a money judgment entered against them for submitting false claims against the Government. Dr. Peterson also appeals from the denial of his entitlement to injunctive relief and tort and breach of contract damages against the defendants. We affirm.

Although much of the complicated statutory and factual background of this and the cognate cases [1] has been treated in the district court's opinion,[2] and in this Court's opinion on the appeal of the criminal trial of the Peterson brothers,[3] a recount of the salient facts is helpful to focus upon the issues raised by the Petersons.

James Peterson was the president, director, and a 69 per cent stockholder of Concord Manor Nursing Home, an extended care facility. He was also the sole owner of Zodiac Enterprises, Inc., which contracted with Concord and other nursing homes to provide physical therapy services to their patients. In 1968, Concord was a certified provider of services under Part A of the Medicare program. Medicare payments were handled through a fiscal intermediary, Mutual of Omaha, to whom Concord submitted its bills for services rendered at the nursing home at a daily rate which included physical therapy. Zodiac could not submit bills for its physical therapy services directly to the Medicare intermediary because Zodiac and Concord were related corporations, i. e., James Peterson was the sole owner of one and held the controlling interest in the other. Therefore, the only way Zodiac could be reimbursed by Medicare for its services was for Concord to include physical therapy in its bills to Omaha. Only the cost, without profit, of services rendered was reimbursable. Concord was required to file cost reports each year with Omaha so it

---

1. Peterson v. Blue Cross and Peterson v. West, 5 Cir. 1975, 508 F.2d 55, this day decided.

2. Peterson v. Richardson, N.D.Tex.1973, 370 F.Supp. 1259.

3. United States v. Peterson, 5 Cir. 1974, 488 F.2d 645.

could determine the appropriate allowable cost. Concord failed to file these reports for 1967, and after three notices and the reduction of allowable daily rates, payments were stopped on March 1, 1969, and it ceased being a provider on August 31, 1969.

Thus, early in 1969, James Peterson was faced with a dilemma regarding physical therapy services: Zodiac could not bill directly for therapy services it had furnished to Concord in the first six months of 1968, and payments to Concord under Part A had been stopped. Thereupon, Peterson directed his employee, Morton, to prepare Part B claim forms and "get them out as soon as possible so he could get the money back in." This necessitated the use of a form different from that used for Part A in that it required a physician's personalized provider number and the physician's signature certifying that the service had been rendered by him personally or under his personal direction. Morton and another employee prepared 120 Part B claims, signed Dr. Peterson's name and provider number to them, and put James Peterson's Post Office box number on the forms rather than Dr. Peterson's address. Morton testified that "Mr. Peterson gave us the instructions on all of the forms."

The Part B claims for Medicare payments were then sent to Blue Cross/Blue Shield of Texas which operated the Medicare program as an agent of the United States on a non-profit basis pursuant to a written contract executed under the provisions of 42 U.S.C.A. §§ 1395h and 1395u. All of the claims were paid by checks made payable to Dr. Peterson and mailed to him.

The circumstances surrounding Dr. Peterson's receipt and handling of the checks are far from clear. He testified that he assumed the checks were made out and sent to him because he was the medical director of Zodiac. He called his brother to find out why he got checks for physical therapy that he had not billed. James Peterson told him that "the claims had been filed." The doctor didn't ask why the checks had been made to him, nor did he contact Group Medical. He simply told James Peterson that he would forward the funds. Instead of endorsing the checks, Dr. Peterson deposited them to his own account and sent his personal check with a notation "account payable" to James Peterson, who deposited it in the Zodiac account.

Dr. Peterson was not on the payroll of Zodiac. He knew that the 120 checks payable to him did not belong to him. He knew he had never personally rendered any of the services in question. Subsequently and inexplicably, Dr. Peterson received six invoices from Zodiac for the therapy services rendered during the first six months of 1968 at Concord which comprised the 120 claims. Dr. Peterson did not pay the amount of the invoices because he "didn't think he owed the money." James Peterson's version was that Dr. Peterson had been billed for physical therapy services rendered while the doctor was medical director of Zodiac. He claimed that Dr. Peterson's check was in payment of the invoices. This is inexplicable because Dr. Peterson sent his check to James Peterson on June 3, 1969, and the Zodiac invoices were not prepared or sent to Dr. Peterson until July, 1969. Moreover, neither James Peterson nor Dr. Peterson could give any plausible explanation why Zodiac should bill its medical director for services its physical therapy department performed. Finally, also without explanation was the notation on Dr. Peterson's check to Zodiac, "account payable."

In July, 1969, a complaint was received by Gruninger, Program Integrity Specialist, Bureau of Health Insurance, Department of Health, Education and Welfare. The niece of a Medicare beneficiary at Concord questioned the payment to Dr. Peterson for physical therapy services not rendered by him. There followed an investigation concerning claims filed over the signature of Dr. Peterson for physical therapy rendered at Concord for the first six months of 1968 and submitted for payment in April

of 1969. The investigation revealed that although Dr. Peterson's name appeared on the claim forms, he had not personally rendered the services, nor had they been performed under his personal direction. In December, 1969, because of the possibility of fraud, Gruninger issued a letter to Blue Cross/Blue Shield ordering suspension of further payments to Dr. Peterson under the Medicare program. In May, 1970, a conference was held with Dr. Peterson in which he was given an opportunity to respond to accusations made against him. Through counsel he subsequently replied by letter. The suspension, however, remained in effect.

Dr. Peterson responded by filing suit seeking to enjoin the defendants from wrongfully withholding funds due him under the Medicare Act. He also alleged that certain torts precipitated his suspension from the Medicare program. The Government filed a counterclaim against Dr. Peterson and a third party complaint against James Peterson for submission of false claims. A criminal indictment was also returned against the Peterson brothers which resulted in the conviction of both on one count of conspiracy, and of James Peterson on 39 substantive counts of submission of false claims (representing 39 of the 120 claims in the instant suit). On appeal this Court affirmed the conviction of James Peterson on the substantive counts and reversed the conviction of both Petersons on the conspiracy count.[4]

Upon the trial of Dr. Peterson's complaint and the Government's counterclaim and third party claim, the district court found that Dr. Peterson was entitled to neither injunctive relief, nor tort or breach of contract damages against any of the defendants, and dismissed his complaint. The major portion of the trial was then devoted to the Government's

claims. The court found that the Peterson brothers had violated the False Claims Act, 31 U.S.C.A. § 231, by knowingly submitting to the Government 120 false claims totaling $16,153.44, and thereupon entered a joint and several judgment for $31,606.72 representing double damages, together with the sum of $100,000 representing a $2,000 forfeiture for 50 of the 120 claims in question, with interest awarded from the date of judgment.

### Dr. Peterson's Tort Claims

We first turn to Dr. Peterson's prayer for compensatory and punitive damages for the alleged tortious conduct of the defendants. He asserts that the Government and the individual defendants conspired to destroy him and to make it impossible for him to practice as a physician, and that the defendants took his property without due process, and wrongfully and maliciously interfered with his contractual rights. To support these charges, Dr. Peterson argues that he was wrongfully suspended from the Medicare program without notice or a hearing by employees of the Bureau of Health Insurance, H.E.W., who had no authority to impose sanctions, and that this was accomplished as a part of a conspiracy with the Government. Further, he complains that he was required to respond to criminal indictments and defend himself in a criminal trial as well as defend against the Government's counterclaim for liability under the False Claims Act in the instant suit.[5]

We have combed the record to find some basis for the numerous claims of tortious conduct on the part of the defendants and can find no evidence to support any of them. Evidence of a conspiracy between the Government and the individual and corporate defendants is non-existent. The suspension of Dr. Pe-

---

4. See note 3 *supra*. The Court found that the jury lacked sufficient evidence to find Dr. Peterson guilty of conspiracy; reversing his conviction removed James Peterson's confederate, so the latter's conviction for conspiracy was also reversed.

5. Dr. Peterson has conceded that the Government is not liable under the Federal Tort Claims Act for malicious prosecution and interference with contract rights. See 28 U.S. C.A. § 2680(h).

terson and the withholding of payments due him by H.E.W. employees were actions both appropriate and necessary under instructions requiring the immediate suspension of any doctor participating in the Medicare program upon the discovery of possible fraud in the submission of claims under the Act. Bureau of Health Insurance Identical Memorandum No. 176, June 11, 1969. There is not a scintilla of evidence that the actions taken by the Bureau of Health Insurance employees were prompted by any reason other than to protect the integrity of the program. The corporate defendants, as fiscal intermediaries, did no more than act on the instructions received by them. This they were required to do. Convinced, as we are, that Dr. Peterson caused false claims to be made, we agree with the district court that the conduct of the defendants was neither malicious, negligent, nor unreasonable in the circumstances.

■ Finally, we are unpersuaded that Dr. Peterson's property was taken without due process. His argument, premised upon Goldberg v. Kelly, 1970, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287, is that H.E.W. was not entitled without a hearing to withhold funds due him under Medicare as an offset against false claims then under investigation.

We note that the district court, by preliminary injunction, ordered the withheld funds paid to Dr. Peterson upon his posting of a bond to indemnify the Government should the claims indeed prove false. This was accomplished. Since the funds were no longer held by the Government, this removes this case from the parameters of Goldberg. In any event, Dr. Peterson's argument is laid to rest by our decision in Hilburn v. Butz, 5 Cir. 1972, 463 F.2d 1207. There, the Hilburn family were concededly owed money under various Department of Agriculture programs. After an investigation, the Secretary administratively determined that the Hilburns had been overpaid under the same programs in previous years and that the monies presently owed them should be applied to offset such overpayments. We held that the Secretary had the right to withhold current funds equal to the overpaid funds, at least until the issues relating to the overpayments were judicially determined. Judge Clark, reasoning in a manner eminently appropriate to this case, held Goldberg inapplicable saying:

> The result in Goldberg v. Kelly was based on a judicial notice of the fact that welfare recipients as a class would be deprived of their very means of existence while awaiting the outcome of a post-termination hearing. In turn, those recipients' necessary search for daily subsistence would adversely affect their ability to seek redress from the welfare bureaucracy. No evidence of any such dire consequences was adduced in this case. Hilburn v. Butz, 463 F.2d at 1209.

We conclude that there was no denial of due process, and that Dr. Peterson wholly failed to prove tortious conduct on the part of any of the defendants; the district court properly entered judgment in their favor.

### Immunity from Liability

The defendants urged the district court to dismiss Dr. Peterson's amended complaint for tort liability on the ground of official immunity. The court declined to do so at that stage of the proceedings, but, after hearing all of the evidence, concluded that their claim of immunity was well taken. We agree.

■ With respect to defendants, Secretary of H.E.W. and the United States of America, there can be no question that this was an unconsented suit against the sovereign over which the court lacked jurisdiction. The individual defendants were all employees of the Bureau of Health Insurance, Department of Health, Education and Welfare. McSteen was the Regional Representative responsible for the administration of the Medicare program in five states, including Texas. Adams supervised all of the work on fraud and abuse cases, including Dr. Peterson's case. Gruninger

was a program integrity specialist whose responsibility it was to investigate claims of fraud and abuse and forward them for prosecution where indicated. Chancellor was also on the program integrity staff of the Dallas, Texas, regional office. He had the responsibility of contacting the families of beneficiaries who had been billed for services by Dr. Peterson. Dr. Peterson's case was processed and investigated in precisely the same manner as other suspected fraud cases. His suspension was effected as required by Bureau of Health Insurance Identical Memorandum No. 176, June 11, 1969.[6] Peterson's argument that the individual defendants were guilty of gross negligence in improperly imposing sanctions on the wrong person, without just cause, in conspiracy with one another and with the Government, and outside the scope of their employment, is wholly unfounded. There is not the slightest indication that any of the individual defendants acted outside of their line of duty or the scope of their employment in carrying out their official responsibilities.

We find equally without merit Dr. Peterson's contention that the individual defendants were lower echelon employees who are not entitled to claim immunity. In the seminal case of Barr v. Matteo, the Supreme Court reasoned that:

> The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy. (footnote omitted.)
>
> . . . It is not the title of his office but the duties with which the par-

ticular officer sought to be made to respond in damages is entrusted—the relation of the act complained of to "matters committed by law to his control or supervision," Spaulding v. Vilas, *supra,* 161 U.S. [483,] at 498, [16 S.Ct. [631,] at page 637], 40 L.Ed. 780 —which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits. (1959), 360 U.S. 564, 573–574, 79 S.Ct. 1335, 1340–1341, 3 L.Ed.2d 1434.

Pared of distracting shadow contentions, the acts complained of were

> the result of a judgment or decision which it is necessary that the Government official be free to make without fear or threat of vexatious or fictitious suits and alleged personal liability.

Norton v. McShane, 5 Cir. 1964, 332 F.2d 855, 859, citing with approval Ove Gustavsson Contracting Co. v. Floete, 2 Cir. 1962, 299 F.2d 655, cert. denied, 374 U.S. 827, 83 S.Ct. 1862, 10 L.Ed.2d 1050. *See also* Scheuer v. Rhodes, 1974, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90; Chafin v. Pratt, 5 Cir. 1966, 358 F.2d 349. The alleged tortious acts were committed by agents of the Government responsible for the integrity of the Medicare program during the course of an investigation of purported violations of the Medicare Act; all the agents were shielded by immunity. Waymire v. Deneve, 5 Cir. 1964, 333 F.2d 149.

█ We need not tarry long with respect to the asserted tort liability and the immunity of the corporate defendants. They are Medicare fiscal intermediaries who act as agents at the sole direction of the Secretary of Health, Education and Welfare pursuant to 42 U.S. C.A. §§ 1395h and 1395u.[7] In this situa-

---

6. The Memorandum provides in pertinent part: "Where cases of potential fraud are uncovered, the carrier should be instructed by the R.O. [Regional Office] to withhold payments in all pending assigned claims from the 'suspect' until the investigation is completed and conclusion reached as to whether fraud was perpetrated and, if so, what further action is to be taken."

7. Under regulations promulgated by the Department it is provided that "In the performance of their contractual undertakings, the carriers act on behalf of the Secretary, carrying on for him the administrative responsibilities imposed by the law. The Secretary, however, is the real party in interest in the administration of the program. . . . " 20 C.F.R. § 405.670 (1973).

tion the United States is the real party in interest. Under the doctrine of sovereign immunity, the district court lacked jurisdiction over all these defendants, both governmental and private as agents of the Government. *Cf.* Pine View Gardens, Inc. v. Mutual of Omaha Insurance Co., 1973, 158 U.S.App.D.C. 294, 485 F.2d 1073; Johnson v. Johnson, E.D.Pa.1971, 332 F.Supp. 510; Kuenstler v. Occidental Life Insurance Company, C.D.Cal.1968, 292 F.Supp. 532.

### Government's Counterclaim and Third Party Complaint

■ By its counterclaim and third party complaint, the Government sought recovery against the Peterson brothers under the False Claims Act, 31 U.S.C.A. § 231. As a common defense they urge that the Act was not violated because the physical therapy services were performed by qualified people, the patients receiving these services were entitled to them under Medicare, there was no financial loss to the Government, and the monies paid by the Government were therefore a liability which the Government was statutorily obligated to pay. This argument is unsound.

The claim forms here involved contain a place for the signature of physician or supplier, and the statement "(A physician's signature certifies that physician's services were personally rendered by him or under his personal direction)." Each claim submitted bore Dr. Peterson's purported signature (written by Morton) certifying something that simply was not so: Dr. Peterson did not personally render the service, nor was it rendered under his personal supervision. The services were rendered by Zodiac who was not a certified provider. It could not have been paid, had it submitted a bill to Blue Cross. Furthermore, it is abundantly clear that Dr. Peterson was not the medical director of Zodiac, nor had he any supervision over the physical therapist who actually rendered the services. In short, the services billed were plainly not "covered" services, and the Government thus paid on the basis of the false claims presented.

As a further common defense, the Petersons argue that there is no statutory or regulatory requirement for the physician's certification; thus, they contend, the certification is not material to the claim, so no liability can attach to a false certification. This contention is without merit. It is, of course, true that the statute does not prescribe the type of claim form required, but it does provide that under Part B the services must be performed by a physician or as an incident to a physician's service. It was entirely reasonable and necessary for the Government to require such a certification on the claim forms to implement the Act, and at the same time protect public funds. Obviously, a false certification on the claim form frustrated the Government's attempt to process only valid claims and led to the payment for services which were not covered or payable under the Act.

■ James Peterson next argues that "there is no delineation as to whether the court found a 'false' statement or a 'fraudulent' statement. Further, there is no distinction as to the falsity or the fraudulence of the 'claim,' or whether there was a 'claim.'" This is a futile exercise in semantics. A claim is within the purview of the False Claims Act if it is grounded in fraud which might result in financial loss to the Government. Simply stated:

> This remedial statute reaches beyond "claims" which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money. United States v. Neifert-White Co., 1968, 390 U.S. 228, 233, 88 S.Ct. 959, 962, 19 L.Ed.2d 1061.

The inclusiveness of the statute was spelled out in United States ex rel. Marcus v. Hess, 1943, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443.

> These provisions, considered together, indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the govern-

ment. 317 U.S. at 544–545, 63 S.Ct. at 384.

■ Finally, James Peterson faults the Government for failing to bear its burden of proving *scienter;* he claims the evidence did not demonstrate his personal knowledge and participation in the false certification of the claims. In restating the applicable test, we said in United States v. Aerodex, Inc., 5 Cir. 1972, 469 F.2d 1003;

> The law is settled in this Circuit that to show a violation of the False Claims Act the evidence must demonstrate "guilty knowledge of a purpose on the part of [the defendant] to cheat the Government," United States v. Priola, 272 F.2d 589, 594 (5th Cir. 1959), or "knowledge or guilty intent," United States v. Ridglea State Bank, 357 F.2d 495, 498 (5th Cir. 1966). *See also* Henry v. United States, 424 F.2d 677 (5th Cir. 1970). 469 F.2d at 1007.

James Peterson insists that he did not instruct Morton to sign Dr. Peterson's name to the forms but simply told her "to get them out as soon as possible." It was Dr. Peterson's responsibility, so James Peterson contends, to prepare and sign the forms as Medical Director of Zodiac, but the preparation of the forms was done by Concord personnel as a convenience because the records were kept there. We are convinced, however, that the record fully supports the district court's finding that Morton signed Dr. Peterson's name and provider number and James Peterson's post office box number to the claims at the direction of James Peterson. We are equally convinced, for the reasons we have previously stated, that Dr. Peterson was not the medical director of Zodiac and that this was a title trumped up in an effort to circumvent the requirements of the Act.

There was ample evidence to conclude that James Peterson had knowledge or guilty intent to make false claims against the Government.[8]

We have considered the additional attacks made by James Peterson on the findings of fact. They raise immaterial discrepancies that cannot be parlayed into a reversal. The findings are not clearly erroneous. McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20. On the contrary, they have substantial support in the record. The other errors asserted by James Peterson do not merit discussion.

Dr. Donald Peterson argues (in addition to the common defenses raised with his brother) that he is not personally liable under the False Claims Act because he had neither the intent to cause a financial loss to the Government nor the knowledge that the claims submitted by James Peterson contained a false or fraudulent statement. To support his argument, Dr. Peterson points out that he served as the medical director for Zodiac for the first six months of 1968. He knew the checks he received were for physical therapy services rendered by Zodiac at Concord and therefore thought this money belonged to Zodiac. He paid the money to Zodiac in good faith, knowing nothing about the contents of the claims filed. If this were the end of the story, Dr. Peterson would surely not be liable under the Act. But the parlous journey he began does not come to an end so quickly.

Not later than the first week in May of 1969, Dr. Peterson received from Group Medical and Surgical Service 120 individual checks made out to him totaling $15,803.36. Of these, 110 checks were dated April 28, 1969, and 10 checks were dated either May 1 or 2, 1969. At-

---

8. On almost parallel evidence James Peterson was convicted on 39 counts under 18 U.S.C.A. § 1001 of the substantive offenses of unlawfully and knowingly making false statements of material facts to a government agency. This Court held that the overwhelming evidence established that Dr. Peterson did not in fact supervise the administering of physical therapy to any particular Zodiac patients, and that the evidence was sufficient to support the jury's finding that James Peterson had made willful misrepresentations on the claim forms filed with Group Medical and Surgical Service. United States v. Peterson, 5 Cir. 1974, 488 F.2d 645.

tached to each check was an "Explanation of Medicare" which set forth the name of the patient, that the services were provided by D. M. Peterson, D.O., his unique identifying number, the date and amount of the charge submitted, the amount allowed, the fact that the funds were assigned to the doctor, and the total amount of the Medicare payment. This "Explanation" and the accompanying check, made payable to D. M. Peterson, D.O., were sent to Dr. Peterson at his correct address in Dallas, Texas. For some reason, left unexplained in the record, the checks were not deposited until June 9, 1969, over a month after their receipt. In the meantime, however, on June 3, 1969, six days before depositing the 120 checks, Dr. Peterson sent to James Peterson his personal check made to Zodiac.

We reiterate that the district court was fully justified in finding that Dr. Peterson was not the medical director of Zodiac. He had no basis for assuming that the checks were sent to him because he was the medical director of Zodiac. On the contrary, the Medicare Explanation accompanying each check indicated that the claim was being paid to him personally and that the services were provided by him, under his unique identifying number, when in fact they were not. Under the circumstances, we agree with the district court that the act of Dr. Peterson in endorsing the checks and depositing them with the knowledge that he was not entitled to the proceeds was for the purpose of aiding James Peterson in obtaining payment and constitutes the making of a false claim as to each check. By this maneuver James Peterson and Zodiac ended up obtaining Government funds to which they were not entitled. The payment of the 120 claims would never have been questioned except for the complaints of patients who had never heard of Dr. Peterson.

*Other Errors Asserted by Dr. Peterson*

Dr. Peterson complains that the district court erred in refusing to enter judgment for him for the sums, plus interest, due him that were withheld during his suspension from the Medicare program. This issue is no longer viable. The district court granted a preliminary injunction in favor of Dr. Peterson, ordering that the Government pay him all sums due on claims which had been filed, and conditioned upon his posting a bond to secure the amount of any set-off that might ultimately be due the Government on its counterclaim. The bond was posted and Dr. Peterson received his money. Dr. Peterson is not entitled to interest for the period that the sums were withheld. "It is well established that the United States is not liable for interest in the absence of a contractual or statutory requirement to pay interest." United States v. Delaware Tribe of Indians, 1970, 427 F.2d 1218, 1222, 192 Ct.Cl. 385. There is no statutory provision for the payment of interest under 42 U.S.C.A. § 1395, 28 U.S.C.A. § 1331, or 28 U.S.C.A. § 1361.

Next, Dr. Peterson argues that he was denied a fair trial because the court changed the order of proof, unduly limited his time for presenting his case, and acted as trial attorney for the Government. These charges border on the frivolous. The district court properly required that liability be established before proof of damages was offered, and it was within the court's discretion, which was soundly exercised, to initially try the issues raised by the counterclaim. Each witness offered on that phase of the case was, however, subjected to examination and cross-examination, without time limitation, in support of Dr. Peterson's claims of tortious conduct. Finally, the record is devoid of the slightest suggestion that the court was an advocate for the Government. Moreover, these and other evidentiary errors asserted by Dr. Peterson were not the subject of objection below and cannot be raised for the first time on appeal. D. H. Overmyer Co. v. Loflin, 5 Cir. 1971, 440 F.2d 1213.

Dr. Peterson's contention that he was denied due process in connection with

the suspension of his Medicare payments is unfounded. There is no administrative procedure prescribed by statute or regulation for suspension of Medicare recipients suspected of fraud. They, of course, have recourse to the courts for review of the action taken. Aquavella v. Richardson, 2 Cir. 1971, 437 F.2d 397. Here Dr. Peterson received a full hearing on the Government's claim of fraud.

Without further extending this opinion it is sufficient to say that we have carefully considered the various other issues raised by Dr. Peterson and find them meritless.

### The Government's Asserted Errors

The Government urges that the district court erred in refusing to award interest on the fraudulent claims from the date the payment was made to the Petersons. We disagree. We subscribe to the view that since double damages, plus a specified sum, was provided in the False Claims Act for the purpose of making sure that the Government would be made completely whole, it is error to assess prejudgment interest on the recoverable amount. United States v. Foster Wheeler Corp., 2 Cir. 1971, 447 F.2d 100.

Finally, the Government argues that since the district court found that 120 false claims had been filed, it should have assessed a $2,000 forfeiture for each false claim, or a total of $240,-000, as provided in 31 U.S.C.A. § 231, instead of limiting the forfeiture to 50 claims totaling $100,000. The short answer is that the Government did not file a cross-appeal and may not now be heard to complain of the judgment entered below. In any event, the Government tacitly admits that the court may exercise discretion where the imposition of forfeitures might prove excessive and out of proportion to the damages sustained by the Government. The forfeiture should reflect a fair ratio to damages to insure that the Government completely recoups its losses. United States v. Hess, *supra;* Toepleman v. United States, 4 Cir. 1959, 263 F.2d 697. The

district court used sound discretion in the imposition of forfeiture in this case.

We are satisfied that the issues were fully and fairly tried. The findings of fact have substantial support in the record and are not clearly erroneous. Proper legal conclusions were reached by the district court. Finding no error the judgment is

Affirmed.