822 F.2d 987
 NU-AIR MANUFACTURING COMPANY, a Florida Corporation,
Plaintiff-Appellant,
v.
FRANK B. HALL & CO. OF NEW YORK, a corporation incorporated
under the laws of the State of New York, doing business as
Intercredit Agency, Aetna Casualty and Surety Company, Inc.,
et al., Defendants-Appellees.
 No. 86-3359.
 United States Court of Appeals,
Eleventh Circuit.
 July 24, 1987.
Rehearing and Rehearing En Banc Denied Aug. 31, 1987.
 
 Stuart C. Markman, Winkles, Trombley & Kynes, David Hyman, Tampa, Fla., for plaintiff-appellant.
 John F. Rudy, II, Tampa, Fla., for defendants-appellees.
 John D. Shofi, Tampa, Fla., for Frank B. Hall & Co.
 Henry A. Hubschman, Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C., Robert Paul Parker, Donald W. Stanley, Marlow, Shofi, Smith, Hennen & Smith, Tampa, Fla., for Foreign Credit Ins. Ass'n, et al.
 Appeal from the United States District Court for the Middle District of Florida.
 Before TJOFLAT and VANCE, Circuit Judges, and ATKINS*, Senior District Judge.
 VANCE, Circuit Judge:
 
 
 1
 This appeal arises out of a manufacturer's suit against its insurer and insurance broker for misrepresentation, negligence, and breach of contract. The district court granted summary judgment for defendants on all claims. We reverse on all counts.
 
 I. Facts and Procedural History
 
 2
 Nu-Air Manufacturing Co. (hereinafter "Nu-Air") is a Florida Corporation engaged in the business of assembling aluminum goods. In early 1982, Nu-Air negotiated with a Nigerian buyer for the sale of 12 containers of custom-made doors and windows. The Nigerian buyer was to pay half the price by letter of credit and the other half by sight draft upon delivery.
 
 
 3
 Because of the large size of the order and Nu-Air's unfamiliarity with Nigerian practices, Nu-Air would not accept the order without first obtaining export insurance to cover that portion of the purchase price left unsecured by the letter of credit. Accordingly, Nu-Air designated Intercredit Agency (hereinafter "Intercredit") as its broker.[1] Intercredit, in turn, contacted an export insurer, Foreign Credit Insurance Association (hereinafter "FCIA").[2]
 
 
 4
 The standard FCIA master policy provides $200,000 in coverage. In order to insure a specific transaction beyond this standard coverage, FCIA will issue a Special Buyer Credit Limit (hereinafter "SBCL"). Nu-Air completed an application for an SBCL in order to increase the $200,000 limit to $371,530.49. Jane Ferry, Intercredit's senior vice president, submitted to FCIA both an application for a master policy and an application for an SBCL.
 
 
 5
 FCIA frequently approves the master policy and SBCL together because the insured would not want to subscribe to the master policy without the SBCL. Jane Ferry testified that she marked the SBCL application "approved per Michele" after Michele Milone, an FCIA sales representative, telephoned on March 3, 1982 FCIA's approval of both the master policy and SBCL applications. Milone agrees that she telephoned Ferry with a quotation for a master policy, but denies that she communicated FCIA's approval of the SBCL.[3] That same day, Ferry informed Nu-Air that both the master policy and the SBCL had been approved. Nu-Air immediately accepted the Nigerian order, relying on Intercredit's word that insurance coverage was in place. In fact, FCIA had not yet completed the paperwork for the SBCL and had only processed the standard $200,000 master policy.
 
 
 6
 On March 4, 1982, FCIA delivered to Intercredit a document containing a quotation for a master policy. This document specified a $200,000 limit and made no reference to the SBCL application. One week later, Intercredit forwarded the document to Nu-Air. Jack Healey, Nu-Air's comptroller, reviewed the quotation and executed the document, assuming that FCIA would increase the $200,000 limit to match the $371,530.49 SBCL, which, according to Intercredit, FCIA had already approved.[4] Soon afterwards, Intercredit returned the signed quotation to FCIA, along with Nu-Air's initial deposit towards the premiums. On March 24, 1982, Nu-Air received an FCIA policy. Nu-Air's policy did not include an SBCL endorsement.[5]
 
 
 7
 Because of import restrictions imposed by the Nigerian government, FCIA concluded that it could not issue Nu-Air an SBCL. On March 19, 1982, FCIA orally informed Intercredit, Nu-Air's broker, that FCIA had decided to withdraw Nu-Air's SBCL application. On April 2, 1982, FCIA mailed written confirmation of this decision to Nu-Air. Nu-Air did not receive this confirmation until April 12, 1982.[6] On March 16, 1982, Nu-Air had begun shipping the order to Jacksonville, Florida, the point of departure for Nigeria. By the time Nu-Air received the notice of cancellation, eight of the twelve containers had already been shipped to Jacksonville and Nu-Air had fabricated almost all of the remaining four.
 
 
 8
 Immediately after learning that FCIA would not issue an SBCL, Nu-Air contacted Ferry at Intercredit. Ferry informed Healey, the Nu-Air officer responsible for obtaining the insurance, that FCIA had not issued an SBCL and that Nu-Air would not have insurance coverage for the transaction.[7] Ferry advised Healey not to make the shipments. Nevertheless, Nu-Air continued to ship the containers to Jacksonville, and on April 30, 1982, Nu-Air shipped the entire order to Nigeria.[8] On August 15, 1982, the Nigerian buyer defaulted on the sight draft. Subsequent demands for payment met with no success.
 
 
 9
 In early 1983, Nu-Air notified FCIA of the overdue account and filed a claim under the SBCL. FCIA denied the claim, alleging that no coverage existed. FCIA now contends that Nu-Air failed to give notice or pay premiums within the time restrictions of the policy.
 
 
 10
 On January 30, 1984, Nu-Air filed this lawsuit against Intercredit and FCIA. Counts I and II of Nu-Air's complaint stated claims against FCIA for breach of insurance contract and negligent misrepresentation. Counts III, IV and V stated three separate claims against Intercredit. Count III alleged that Intercredit breached its oral agreement to procure and maintain insurance. Count IV alleged that Intercredit negligently failed to maintain coverage. Count V alleged that Intercredit negligently misrepresented the existence of coverage. The district court granted the defendants' motions for summary judgment on all counts.[9] We reverse on all counts.
 
 
 11
 II. The Breach of Contract Claim Against FCIA
 
 
 12
 We begin by noting that Florida recognizes oral insurance contracts. Collins v. Aetna Ins. Co., 103 Fla. 848, 138 So. 369, 370 (1931); Monogram Products, Inc. v. Berkowitz, 392 So.2d 1353, 1355 (Fla.Dist.Ct.App.1980); Burns v. Consolidated Am. Ins. Co., 359 So.2d 1203, 1207 (Fla.Dist.Ct.App.1978); State Farm Fire & Casualty Co. v. Hicks, 184 So.2d 685, 686 (Fla.Dist.Ct.App.), cert. denied, 189 So.2d 634 (1966). Such a contract, like any other contract, results from an offer and an acceptance of that offer. Rosin v. Peninsular Life Ins. Co., 116 So.2d 798, 801 (Fla.Dist.Ct.App.1960). To be enforceable, the agreement must encompass the following essential terms: subject-matter, risk, amount of insurance, premium, duration of risk and identity of parties. Collins v. Aetna Ins. Co., 138 So. at 370; State Farm Fire & Casualty Co. v. Hicks, 184 So.2d at 686.
 
 
 13
 Michele Milone relayed to Jane Ferry a policy quotation incorporating all of these essential terms.[10] A jury could find that this oral communication constituted an offer to enter into an insurance contract[11] despite the fact that the parties dispute the term in this offer specifying the amount of insurance.[12] Nu-Air contends that it manifested its assent on March 10, 1982 by sending FCIA an executed document specifying the policy quotation.[13] Nu-Air also sent FCIA an initial deposit on the premiums.[14] Thus a jury could find that a contract was made on that date. See 1 S. Williston, A Treatise On The Law of Contracts section 66 (3d ed. 1957 & Supp.1986);[15] E. Farnsworth, Contracts, 136 (1982).[16]
 
 
 14
 To be sure, the parties dispute an important factual question: whether Michele Milone communicated FCIA's approval of Nu-Air's SBCL application at the same time she gave Jane Ferry the quotation on the master policy. A jury must decide whether FCIA offered to provide the full $371,530.49 in requested coverage or only the $200,000 in coverage that is standard for an FCIA master policy. If the jury believes Michele Milone, it may find that the final contractual term specifying the amount of insurance corresponded to the $200,000 limit that is standard for an FCIA master policy. Alternatively, if the jury believes Jane Ferry, it may find that this term corresponded to the amount specified in Nu-Air's SBCL application. This dispute does not alter our conclusion that a jury could find that a contract was entered into on March 10, 1982.
 
 
 15
 Courts must determine the terms of a contract by ascertaining the intent of the parties at the time they enter into the agreement. See, e.g., J & S Coin Operated Machines, Inc. v. Gottlieb, 362 So.2d 38, 39 (Fla.Dist.Ct.App.1978). The lower court, nevertheless, held that an agreement to provide the full $371,530.49 in requested coverage would be unenforceable because the master policy contemplated that FCIA would approve the SBCL "by written notification."[17] Although Nu-Air did not receive the final version of the master policy until March 24, the parties may have negotiated with this document in mind. Nevertheless, if FCIA informed Nu-Air that SBCL coverage had already been approved, this understanding became part of the final contract.
 
 
 16
 Florida law requires that we resolve a conflict between the provisions of an insurance contract so as to afford maximum coverage to the policyholder. See Dyer v. Nationwide Mut. Fire Ins. Co., 276 So.2d 6, 8 (Fla.1973); Oliver v. United States Fidelity & Guar. Co., 309 So.2d 237, 238 (Fla.Dist.Ct.App.), cert. denied, 322 So.2d 913 (1975). This principle applies with even greater force when the draftsman of a form policy relies on inconspicuous language to defeat the very purpose for which the policy was procured. See Braley v. American Home Assurance Co., 354 So.2d 904, 906 (Fla.Dist.Ct.App.), cert. denied, 359 So.2d 1210 (1978); Roberson v. United Services Auto. Ass'n, 330 So.2d 745, 746 (Fla.Dist.Ct.App.1976), cert. denied, 342 So.2d 1104 (1976). Accordingly, if FCIA offered to provide full coverage, it may not rely on language in the master policy to defeat Nu-Air's legitimate expectation of full coverage. See Braley, 354 So.2d at 906.
 
 
 17
 To rehabilitate the lower court's reasoning, FCIA argues that the parties intended that the oral agreement would not become binding until reduced to a writing. If this was the intention of the parties, we would give it effect. See Club Eden Roc, Inc. v. Tripmasters, Inc., 471 So.2d 1322, 1323-24 (Fla.Dist.Ct.App.1985) (memorandum clearly stated that no rights or obligations will arise until the execution of a formal agreement), review denied, 482 So.2d 350 (Fla.1986); Shipley v. Ohio Nat'l Life Ins. Co., 199 F.Supp. 782, 783 (W.D.Pa.1961) (insurance application required final contract to be in writing), aff'd on other grounds, 296 F.2d 728 (3rd Cir.1961). The mere fact that the parties contemplated future writings does not evince this intent, however, and FCIA does not point to a whit of convincing evidence. See Collins v. Aetna Ins. Co., 103 Fla. 848, 138 So. 369, 370 (Fla.1931); Restatement (Second) of Contracts Sec. 27 (1981).
 
 
 18
 If anything, the record shows that FCIA is notoriously slow in processing its paperwork. Nu-Air could accept the Nigerian contract and begin manufacturing containers only by relying upon its understanding that insurance coverage was in place. The fabric of commerce depends upon interlocking strands of contractual agreements. This fabric would unravel if the creation of contract rights and obligations depended solely upon the flow of paper.
 
 
 19
 The lower court also held that FCIA had properly withdrawn coverage pursuant to a termination clause in the master policy. The termination clause, however, provided that FCIA could only terminate coverage "upon thirty days prior written notice."[18] "Shipments" made before the effective date of termination would remain covered.[19] In the present case, all goods left the United States for Nigeria on April 30, 1982. Nu-Air had no warning that there were problems with its insurance coverage until April 12. On that date, Nu-Air received written confirmation of FCIA's decision to withdraw the SBCL application.[20] Clearly, the April 12 communication did not give the requisite thirty days notice and therefore could not effectively terminate insurance coverage.
 
 
 20
 FCIA argues that Nu-Air received effective notice on March 19 when the insurance company informed Intercredit that Nu-Air's SBCL application had been rejected. We disagree for two reasons. First, the termination clause requires "written notice," whereas the March 19 communication was oral. If FCIA chooses to invoke such clauses, it must abide by their explicit terms. See Graves v. Iowa Mut. Ins. Co., 132 So.2d 393, 395 (Fla.1961). Second, Florida adheres to the generally accepted rule that notice to the insured's broker does not terminate coverage unless the broker procures a substitute policy of like amount. See generally Cat 'N Fiddle, Inc. v. Century Ins. Co., 213 So.2d 701, 704 (Fla.1968); 45 C.J.S. Sec. 450(2) (1946).[21] This rule takes root from an important policy. Notice must clearly convey to the insured the fact of termination so that he may obtain other insurance and avoid being subjected to risk without coverage. See Cat 'N Fiddle, Inc., 213 So.2d at 704; Graves, 132 So.2d at 394-95. As the facts of the present case well demonstrate, notice to a broker is a most precarious means of securing this goal.
 
 
 21
 Finally, the lower court concluded that Nu-Air lost its ability to recover under the policy because Nu-Air failed to provide timely notice of loss and delayed paying premiums. This was also error. The only reason FCIA ever articulated in rejecting Nu-Air's claim was an unconditional denial that the coverage had ever been in force. Where an insurer unconditionally denies liability, it waives all policy provisions governing notification of loss, proof of loss, and payment of premiums:
 
 
 22
 [A]s a matter of law, the effect of the thus-found-to-be-improper repudiation of coverage was to waive any right to insist upon the insureds' necessarily-thus-futile compliance with the various conditions to recovery--including notice....
 
 
 23
 Wegener v. International Bankers Insurance Co., 494 So.2d 259 (Fla.Dist.Ct.App.1986), review denied, 504 So.2d 767 (Fla.1987); see, e.g., Hartford Accident & Indem. Co. v. Phelps, 294 So.2d 362, 365 (Fla.Dist.Ct.App.1974); American Ins. Co. of Newark, N.J. v. Burson, 213 F.2d 487, 490 (5th Cir.1954). The lower court's conclusion was erroneous for the additional reason that FCIA accepted the delinquent premiums. An insurer cannot retain past-due premiums and at the same time claim that a forfeiture of the policy has occurred. Travelers Indem. Co. v. Dana, 434 So.2d 48 (Fla.Dist.Ct.App.1983); Mixson v. Allstate Ins. Co., 388 So.2d 608, 609 (Fla.Dist.Ct.App.1980), review denied, 397 So.2d 777 (1981); Meeks v. State Farm Mut. Auto. Ins. Co., 460 F.2d 776, 778 n. 3 (5th Cir.1972).
 
 
 24
 FCIA suggests that it stands above these general principles of waiver and estoppel because it issues insurance on behalf of a United States government agency, the Export-Import Bank of the United States (hereinafter "Eximbank"). Specifically, FCIA argues that a failure to strictly comply with policy provisions bars recovery whenever the insurer acts as an agent of the United States government.[22] This bold supposition apparently derives from a leading Supreme Court case, Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).[23] A brief summary of that opinion, however, demonstrates that FCIA's reading is too broad.
 
 
 25
 In Federal Crop Insurance Corp. v. Merrill, a farmer had insured reseeded wheat contrary to Federal Crop Insurance Corporation regulations. Id. at 382, 68 S.Ct. at 2. Though the farmer had no knowledge of the regulations and was in fact misled by the government agent, the Supreme Court refused to apply notions of waiver and estoppel. Id. Instead, the Court reasoned that Congress had expressly delegated its rule-making power to the administrative agency, and as a result, the administrative regulations limited the government's liability in the same way as legislation enacted directly by Congress:
 
 
 26
 [This result] merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury. The "terms and conditions" defined by the Corporation, under authority of Congress, for creating liability on the part of the Government preclude recovery for the loss of the reseeded wheat no matter with what good reason the respondents thought they had obtained insurance from the Government.
 
 
 27
 Id. at 385, 68 S.Ct. at 3.
 
 
 28
 The entire logic of Federal Crop Insurance Corp. v. Merrill, boils down to the proposition that a plaintiff who contracts with a governmental defendant "[assumes] the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." Id. at 384, 68 S.Ct. at 3. We find nothing in the Supreme Court's reasoning that bears any application to private contractual arrangements between private litigants.
 
 
 29
 The present case is further distinguished from Federal Crop Insurance Corp. v. Merrill because, under the specific terms of the policy, FCIA remains the sole insurer. Though FCIA may recoup its losses under a separate agreement between FCIA and Eximbank, Nu-Air is not a party to that arrangement. Therefore, unlike the farmer in Federal Crop Insurance Corp. v. Merrill, Nu-Air's claim is not directed toward the public treasury:
 
 
 30
 [Rather], it is FCIA's potential claim against the government under the reinsurance agreements, and not [the insured's], which is directed toward the public fisc; this is not the case before us.
 
 
 31
 Lovell Mfg. v. Export-Import Bank of United States, 777 F.2d 894, 901 (3d Cir.1985). We conclude that traditional equitable principles of waiver and estoppel apply. Id.[24],[25]
 
 III. The Misrepresentation Claim against FCIA
 
 32
 FCIA also relies upon its relationship with Eximbank to assert "official immunity" from Nu-Air's misrepresentation claim. We conclude that the lower court erred in granting this immunity.
 
 
 33
 The official immunity doctrine, largely judge-made, is not a rigid rule of decisionmaking. Rather, the Supreme Court has advised "a discerning inquiry into whether the contributions of immunity to effective government in particular contexts outweigh the perhaps recurring harm to individual citizens." Doe v. McMillan, 412 U.S. 306, 320, 93 S.Ct. 2018, 2028, 36 L.Ed.2d 912 (1973). Courts extend official immunity where the threat of liability "might appreciably inhibit the fearless, vigorous, and effective administration of policies of government." Barr v. Matteo, 360 U.S. 564, 571, 79 S.Ct. 1335, 1339, 3 L.Ed.2d 1434 (1959).[26] Not suprisingly, this concern arises most frequently when the defendant is an individual in public service. See, e.g., Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (U.S. Public Printer and Superintendant of Documents); Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (Director of Rent Stabilization Office); Claus v. Gyorkey, 674 F.2d 427 (5th Cir.1982) (VA Hospital Chief of Lab Services); Evans v. Wright, 582 F.2d 20 (5th Cir.1978) (H.E.W. employees).
 
 
 34
 The justifications for immunity will seldom be present, however, when the defendant's connection with government is limited to a business relationship. Once shielded from tort liability, there is always the danger that a private enterprise will become too fearless, too vigorous and too effective. Thus, courts have only extended official immunity to the private sector on those rare occasions when the need is pressing. Two cases upon which FCIA relies prove the point. Both are defamation actions resulting from reports prepared by private industry for government agencies. See Bushman v. Seiler, 755 F.2d 653 (8th Cir.1985) (consultant to insurance carrier investigating medicare fraud); Becker v. Philco Corp., 372 F.2d 771 (4th Cir.), cert. denied, 389 U.S. 979, 88 S.Ct. 408, 19 L.Ed.2d 473 (1967) (defense contractor preparing security reports on employees). Clearly, exposing informants to this kind of liability frustrates paramount government objectives such as uncovering fraud in government programs and protecting national security. Immunity under these circumstances serves an obvious governmental purpose:
 
 
 35
 Applying immunity here is consistent with protecting "officials who are required to exercise their discretion", and promoting the "public interest in encouraging the vigorous exercise of official authority."
 
 
 36
 Bushman, 755 F.2d at 656 (quoting Butz v. Economou, 438 U.S. 478, 506, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978)).[27] In contrast, FCIA does not identify how immunizing misrepresentations to its customers serves an equivalent purpose or, for that matter, any worthwhile purpose.
 
 
 37
 The remaining cases advanced by FCIA do not deal with official immunity at all, but center upon an altogether different concept--sovereign immunity. In Matranga v. Travelers Ins. Co., 563 F.2d 677 (5th Cir.1977) and Peterson v. Weinberger, 508 F.2d 45 (5th Cir.), cert. denied, 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 47 (1975), we dealt with actions against insurance companies for improperly withholding payments due on medicare claims. These insurance carriers were medicare fiscal intermediaries; the United States government provided the funds. In addition, Department of Health, Education and Welfare regulations explicitly state that "[t]he Secretary ... is the real party in interest in the administration of the program." 20 C.F.R. Sec. 405.670 (1973). As a result, we concluded that these suits were barred because they were actually directed against the United States government. See Matranga, 563 F.2d at 677-78; Peterson, 508 F.2d at 51-52. Wholly different considerations operate in the present case because Eximbank and the United States are not financially at risk.
 
 
 38
 Finally, we cannot ignore the language in the legislation creating Eximbank: "[T]he bank is authorized and empowered ... to sue and be sued, to complain and to defend in any court of competent jurisdiction." 12 U.S.C. Sec. 635(a). Immunity is not favored when a government agency enters the commercial sphere:
 
 
 39
 [W]hen Congress establishes such an agency, authorizes it to engage in commercial and business transactions with the public, and permits it to 'sue and be sued,' it cannot be lightly assumed that restrictions on that authority are to be implied. Rather if the general authority to 'sue and be sued' is to be delimited by implied exceptions, it must be clearly shown that certain types of suits are not consistent with the statutory or constitutional scheme, that an implied restriction of the general authority is necessary to avoid grave interference with the performance of a governmental function, or that for other reasons it was plainly the purpose of Congress to use the 'sue and be sued' clause in a narrow sense.... [I]t must be presumed that when Congress launched a government agency into the commercial world and endowed it with authority to 'sue or be sued,' that agency is not less amenable to judicial process than a private enterprise under like circumstances would be.
 
 
 40
 Franchise Tax Bd. of California v. United States Postal Serv., 467 U.S. 512, 104 S.Ct. 2549, 81 L.Ed.2d 446 (1984) (quoting FHA v. Burr, 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724 (1940)); see also Brady v. Roosevelt Steamship Co., 317 U.S. 575, 581, 63 S.Ct. 425, 428, 87 L.Ed. 471 (1943); Rochester Methodist Hosp. v. Travelers Ins. Co., 728 F.2d 1006, 1012-16 (8th Cir.1984). Since there is no reason to think that Eximbank would be immune from suit, see, e.g., Enterprise Tools, Inc. v. Export-Import Bank of the U.S., 564 F.Supp. 761, 763 (E.D.Ark.1983), FCIA cannot derive immunity as Eximbank's agent. Accordingly, we hold that Nu-Air should have the opportunity to present its tort claim against FCIA to a jury.[28]
 
 IV. Nu-Air's Claims Against Intercredit
 
 41
 The district court rejected Nu-Air's entire cause of action against Intercredit. We conclude that the district court reached this surprising result by misapplying the law to key issues, which were actually questions of fact for the jury. In order to more fully explain our holding, we must briefly set forth the relevant law governing the relationship between Intercredit and Nu-Air.
 
 
 42
 When a broker agrees to obtain insurance for a client, the broker becomes the client's agent. See, e.g., Bennett v. Berk, 400 So.2d 484, 485 (Fla.Dist.Ct.App.1981); First Nat'l Ins. Agency v. Leesburg Transfer & Storage, Inc., 139 So.2d 476, 479 (Fla.Dist.Ct.App.1962). As agent, the broker owes his client a duty of care and a duty to exercise the skill he holds himself out as having. Restatement (Second) of Agency Sec. 379 and comment c (1957); see, e.g., Klonis ex rel. Consolidated Am. Ins. Co. v. Armstrong, 436 So.2d 213, 217 (Fla.Dist.Ct.App.1983), review denied, 449 So.2d 264 (1984); Sheridan v. Greenberg, 391 So.2d 234, 236 (Fla.Dist.Ct.App.1980); Butler v. Scott, 417 F.2d 471, 473 (10th Cir.1969). A breach of these duties may subject the broker to liability in both contract and tort. Monogram Products, Inc. v. Berkowitz, 392 So.2d 1353, 1355 (Fla.Dist.Ct.App.1980); First Nat'l Ins. Agency v. Leesburg Transfer & Storage, Inc., 139 So.2d 476, 479 (Fla.Dist.Ct.App.1962); Restatement (Second) of Agency Sec. 401 comment a (1957). In addition, if a broker falsely represents that a policy has been approved, he may become liable for negligent misrepresentation. See, e.g., Meltsner v. Aetna Casualty & Ins. Co., 177 So.2d 43 (Fla.Dist.Ct.App.1965), cert. denied, 184 So.2d 886 (1966).
 
 
 43
 Intercredit successfully argued before the district court that it had discharged its duties as broker when FCIA agreed to insure Nu-Air under the master policy. We disagree. As a professional, a broker "is charged with the ability to do more than simply fill out application forms." Bell v. O'Leary, 744 F.2d 1370, 1373 (8th Cir.1984). A broker must take all reasonable steps necessary to ensure that insurance is in place. See Sheridan v. Greenberg, 391 So.2d at 236; Haeuber v. Can-Do, Inc. II., 666 F.2d 275, 280 (5th Cir. Unit A 1982). Regardless of whether the jury believes Michelle Milone or Jane Ferry, there is sufficient evidence to support a finding that Intercredit breached its duty to Nu-Air.
 
 
 44
 If Michele Milone is testifying truthfully, Intercredit incorrectly informed Nu-Air that SBCL coverage was in place. A jury could find that this misrepresentation and Intercredit's subsequent failure to correct its initial error amounted to a negligent breach of Intercredit's duty to Nu-Air. A jury could also hold Intercredit liable for the tort of negligent misrepresentation.
 
 
 45
 While it is true that Jane Ferry denied that there was a misrepresentation, the jury could nevertheless find a breach of duty even if it accepts her testimony as truthful. Most of the communications between Nu-Air and FCIA passed through Intercredit as intermediary, yet, Intercredit remained blissfully unaware of the impending crisis. A broker must possess a reasonable knowledge of its business and a reasonable familiarity with the paperwork. See Seascape of Hickory Point Condominium Ass'n v. Associated Ins. Services, 443 So.2d 488 (Fla.Dist.Ct.App.1984). In fact, Jane Ferry testified that she did not notice the disparity between the requested coverage and the $200,000 limit recited by the relevant documents until the time of her deposition. A jury could find that Intercredit breached its duty to Nu-Air when the broker failed to detect the problems with its client's insurance coverage at an earlier date.
 
 
 46
 Intercredit must also account for its failure to inform Nu-Air that FCIA had withdrawn Nu-Air's SBCL application.[29] Three weeks elapsed between the time FCIA informed Intercredit and the date when Nu-Air finally received notice from FCIA. An agent is subject to the duty to keep his principal informed. This duty exists when the agent learns facts the principal would desire to know. See Restatement (Second) of Agency Sec. 381 and comment a (1957). Accordingly, a broker, who is not to blame for the failure to obtain coverage, may become liable for damages if he fails to inform his principal that the requested insurance has not been procured. DeMarlor v. Foley Carter Ins. Co., 386 So.2d 22, 23 (Fla.Dist.Ct.App.1980); Cat 'N Fiddle, Inc. v. Century Ins. Co., 200 So.2d 208, 211 (Fla.Dist.Ct.App.1967), vacated on other grounds, 213 So.2d 701 (Fla.1968). When a broker learns his client's insurance has been cancelled, this same duty requires the broker to notify the insured within a reasonable period of time. Johnson v. Aetna Casualty & Surety Co., 448 So.2d 1056, 1058 (Fla.Dist.Ct.App.), review denied, 458 So.2d 273 (Fla.1984); Cat 'N Fiddle, Inc. v. Century Ins. Co., 200 So.2d at 211. A jury could find that Intercredit breached this duty to Nu-Air when the broker failed to warn its client that FCIA would not supply the requested insurance.[30]
 
 
 47
 Nevertheless, the district court reasoned that any negligence on the part of Intercredit was unimportant because it was unreasonable for Nu-Air to believe its broker.[31] The district court advanced two reasons why Nu-Air unjustifiably relied upon Intercredit's representations that coverage was in place. First, the master policy gave FCIA the right to withdraw coverage at the insurer's discretion. Second, Nu-Air executed a document which specified a $200,000 aggregate limit and made no provision for SBCL coverage.
 
 
 48
 The thrust of the district court's argument appears to be that a broker cannot be held accountable for its misrepresentations so long as the customer has been exposed to the same technical policy information as the broker.[32] Such reasoning misperceives the fundamental nature of the broker-client relationship. This relationship arises from "trust and confidence consensually placed in the superior knowledge, skill and judgment of [the broker]." Butler v. Scott, 417 F.2d 471, 473 (10th Cir.1969) (citation omitted). While there is a point at which this trust becomes unreasonable, this determination should not be made on a motion for summary judgment. See, e.g., McCurley v. Auto-Owners Ins. Co., 356 So.2d 68 (Fla.Dist.Ct.App.1978).[33] Thus, we remand Nu-Air's tort and contract claims against Intercredit for trial before a jury.
 
 
 49
 REVERSED and REMANDED.
 
 
 
 *
 Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 Intercredit, a division of one of the nation's largest insurance brokerage firms, specializes in the business of selling export credit insurance
 
 
 [2]
 FCIA is an association of private insurance companies. FCIA was established in 1961 at the encouragement of the United States Export-Import Bank. See generally Lovell Mfg. v. Export-Import Bank of the United States, 777 F.2d 894, 895 (3rd Cir.1985)
 
 
 [3]
 Ferry has dealt with FCIA on a daily basis for approximately 20 years. At the time of this transaction, Milone had only six months experience with FCIA in export credit insurance sales
 
 
 [4]
 Neither Intercredit nor FCIA delivered paperwork concerning the SBCL
 
 
 [5]
 Ferry testified that she did not notice the disparity between the $371,530.49 SBCL for which Nu-Air applied and the $200,000 limit specified by Nu-Air's policy until the date of her deposition, a year and a half later. Ferry was not alarmed that she had not received SBCL paperwork because she was under the impression that FCIA had already approved SBCL coverage
 
 
 [6]
 Nu-Air did not receive any warning that there were problems with the SBCL before this date
 
 
 [7]
 Neither party suggests in their briefs why no coverage was in place. Since it is undisputed that FCIA approved the $200,000 master policy, it appears to this court that at least $200,000 of coverage was in place at the time
 
 
 [8]
 Pursuant to the terms of the contract, Nu-Air had to ship the entire order representing a sale price of $630,137.20 in order to collect the 50% portion of the sale covered by the letter of credit. Nu-Air claims that the shipment had little salvage value because it was custom-made to Nigerian specifications
 
 
 [9]
 The district judge cited no legal authority of any kind to support her conclusions. None of the conclusions of law in the judge's opinion refer to Nu-Air's claims by count number
 
 
 [10]
 According to Ferry, FCIA would customarily telephone Intercredit with the disposition of an SBCL application. If FCIA decided to accept the application, its representative would customarily communicate the details of the policy quotation during this phone call. Ferry and Milone both agree that Milone stated the parameters of the Nu-Air policy quotation during the course of the March 3 telephone conversation. Ferry testified that she jotted down these parameters, and Nu-Air has offered this notation as an exhibit
 
 
 [11]
 While a "quotation" is usually considered to invite an offer rather than to make one, Restatement (Second) of Contracts Sec. 26 comment c, Ferry's testimony that Malone's communication included all essential elements of an insurance contract and that the policy had been "approved" raises a jury question as to whether Nu-Air had reason to believe that the quotation was intended as an offer. Id.; see E. Farnsworth, Contracts Sec. 3.10 at 126-27 (1982)
 
 
 [12]
 Florida follows the general rule that a broker engaged to procure insurance is the agent of the insured rather than the agent of the insurer. See Empire Fire and Marine Ins. Co. v. Koven, 402 So.2d 1352, 1353 (Fla.Dist.Ct.App.1981); AMI Ins. Agency v. Elie, 394 So.2d 1061, 1062 (Fla.Dist.Ct.App.1981); Auto-Owners Ins. Co. v. Yates, 368 So.2d 634, 636 (Fla.Dist.Ct.App.), cert. denied, 378 So.2d 351 (1979); 3 Couch on Insurance 2d Sec. 25.95 (Rev.ed. 1984); 43 AmJur2d Insurance Sec. 113 (1982). Communicating an offer to Intercredit would therefore be tantamount to making the offer directly to Nu-Air. Ferry immediately communicated the parameters of the quotation to Jack Healey at Nu-Air
 
 
 [13]
 Though this document specified the standard $200,000 aggregate limit, the SBCL would supersede this figure
 
 
 [14]
 It is stipulated that Intercredit forwarded these materials to FCIA and that FCIA retained the premium deposit. Under Florida law, an acceptance becomes binding when it is communicated to the offeror. See Mintzberg v. Golestaneh, 390 So.2d 759, 760 (Fla.Dist.Ct.App.1980); Kendel v. Pntious, 244 So.2d 543, 544 (Fla.Dist.Ct.App.1971), cert. discharged, 261 So.2d 167 (1972)
 
 
 [15]
 The formation of a contract "depends not upon an actual meeting of the minds, but merely upon manifestations of assent...." 1 S. Williston, A Treatise on the Law of Contracts, Sec. 66 (3d ed. 1957); see also E. Farnsworth, Contracts Sec. 3.6 at 114 (1982) (test is whether offeree's actions, judged by a standard of reasonableness, manifest an intention to accept)
 
 
 [16]
 Even if the policy quotation did not constitute an offer, under an alternate form of analysis a jury could find that FCIA's failure to notify Nu-Air that FCIA did not intend to accept Nu-Air's application constituted acceptance. See Restatement (Second) of Contracts Sec. 69(1)(c). In any event, FCIA's retention of Nu-Air's initial deposit raises an issue of fact as to whether FCIA accepted Nu-Air's offer. See Restatement (Second) of Contracts Sec. 69(2); see, e.g., Empire Machine Co. v. Litton Business Telephone Sys., 115 Ariz. 568, 566 P.2d 1044 (1977)
 
 
 [17]
 Article IV.B. of the master policy provides: "The amount of the credit limit for any particular buyer shall be:
 
 
 [1]
 The amount of the Discretionary Credit Limit Authorized in the declarations; or
 
 
 [2]
 Such other amount as the Insurers shall approve by written notification to the Insured of a Special Buyer Credit Limit."
 
 
 [18]
 Article XI.J.2. provides:
 The policy may be terminated by the Insurers or the Insured upon 30 days prior written notice by either to the other. In the event of termination, the Insured shall not be liable for payment of any premium for any shipment made after the effective date of termination and the Insurers shall not be liable for any loss arising from any shipment made subsequent to such date.
 We assume arguendo that this termination provision became part of the oral contract.
 
 
 [19]
 The parties vigorously dispute the meaning of the term "shipment." Nu-Air contends that "shipment" began on the date when the goods left Nu-Air's Tampa factory. Support for this construction comes directly from the policy which defines the "insured transaction" as a sale of products "shipped from the United States ... such shipment to begin when the products are placed en route to the buyer...." An accompanying FCIA publication explains that coverage begins "when the goods leave the factory." On the other hand, FCIA and the district court take the position that shipment occurred on April 30, when the goods left the United States. Florida law requires that courts construe insurance policies so as to provide the broadest possible coverage to the insured. See, e.g., Hulse v. Blue Cross/Blue Shield of Florida, Inc., 424 So.2d 191, 192 (Fla.Dist.Ct.App.1983); Davis v. Crown Life Ins. Co., 696 F.2d 1343, 1345 (11th Cir.1983). Adopting Nu-Air's construction of the term "shipment," we note that 8 of the 12 containers left Tampa by April 14. Even if effective notice were received on March 19, it would not take effect for 30 days and therefore would only terminate coverage on the 4 remaining containers
 
 
 [20]
 "Where a policy provides for written notice of cancellation, but does not specify the method of giving the written notice, and the notice is given by mail, the effective date of cancellation generally is to be determined based on the date of receipt of the notice by the insured." Aetna Ins. Co. v. Settembrino, 324 So.2d 113, 114 (Fla.Dist.Ct.App.1975). In fact, Nu-Air would be completely covered even if the effective date of termination is calculated from the date FCIA mailed this notice of withdrawal, April 2
 
 
 [21]
 Florida recognizes an exception to this rule where the agency relationship "was essentially unlimited, that for all intents and purposes [the broker] was the alter ego of [the insured] in handling the latter's insurance matters, including the exercise of discretion encompassing an increased risk of loss to [the insured]." Cat 'N Fiddle, Inc. v. Century Ins. Co., 213 So.2d at 707
 
 
 [22]
 Congress created Eximbank to provide, among other things, export insurance to American exporters. We assume arguendo that FCIA acted as Eximbank's agent with respect to the disputed coverage. In fact, this matter is not free from doubt. According to the policy, Eximbank insures "political risks and no other." FCIA insures "commercial risks," which include "failure of the buyer to pay to the Insured within six months after due date of payment, the amount due for products delivered, to and accepted by the buyer." Even though Eximbank reinsures commercial risk, this may not be enough to establish an agency relationship. The reinsurance agreements only run between Eximbank and FCIA
 
 
 [23]
 FCIA also cites district court cases. All involve governmental defendants and ultimately rely--directly or indirectly--upon Federal Crop Insurance Corp. v. Merrill. See, e.g., Victoria Camera, Inc. v. Guiffrida, 566 F.Supp. 796, 798 (S.D.N.Y.1983); Pavone, Inc. v. Secretary of H.U.D., 547 F.Supp. 230, 232 (D.Conn.1982); Klein v. Pierce, 554 F.Supp. 18, 20 (S.D.N.Y.1982); Cross Queen, Inc. v. Director, Fed. Emergency Management Agency, 516 F.Supp. 806, 809 (D.V.I.1980). While some lower courts have extracted a broad principle from the original Supreme Court opinion, we do not find these decisions persuasive
 
 
 [24]
 We leave open the question of the extent to which federal law governs insurance contracts issued on behalf of Eximbank
 
 
 [25]
 The district court held that Nu-Air failed to mitigate damages when Nu-Air pressed forward with the Nigerian transaction after discovering the FCIA had repudiated coverage. Though the district court assumed that Nu-Air could renegotiate the Nigerian contract, the defendants present no evidence that such was the case. Whether or not Nu-Air acted reasonably to limit its losses is a question of fact for the jury
 
 
 [26]
 There are other less frequently articulated reasons for affording official immunity: the deterrent effect of liability on those who might enter public service; the drain of litigation on government time and resources; the inequity of liability for the acts of subordinates; the notion that public servants owe a duty to the public, not the individual; and the notion that civil suits are an inappropriate method of enforcing official accountability. Gray v. Bell, 712 F.2d 490, 496-97 (D.C.Cir.1983), cert. denied, 465 U.S. 1100 (1984). These additional justifications most certainly do not apply where the defendant is a private insurance company
 
 
 [27]
 In fact, the common law arrives at this same result by affording such defendants a "qualified privilege." See generally W. Prosser, The Law of Torts, Sec. 115 (4th ed. 1971); see, e.g., Bradley v. Computer Sciences Corp., 643 F.2d 1029, 1032 (4th Cir.), cert. denied, 454 U.S. 940, 102 S.Ct. 476, 70 L.Ed.2d 248 (1981)
 
 
 [28]
 Although the lower court came to a contrary conclusion, the record does not sufficiently show for purposes of summary judgment that Nu-Air unjustifiably relied on the alleged misrepresentations or negligently failed to ascertain the facts. See McCurley v. Auto-Owners Ins. Co., 356 So.2d 68, 69 (Fla.Dist.Ct.App.1978). Whether FCIA and Intercredit negligently made false statements to Nu-Air and whether Nu-Air reasonably relied on the misrepresentations to its detriment are questions for a jury to determine. Horn v. First Orlando Realty Management Corp., 483 So.2d 80 (Fla.Dist.Ct.App.1986)
 
 
 [29]
 It is undisputed that Intercredit never communicated this fact to Nu-Air
 
 
 [30]
 Intercredit is therefore wrong to suggest that it could not be liable if FCIA properly availed itself of policy provisions which gave FCIA the right to withdraw coverage
 
 
 [31]
 Ruling that Nu-Air's reliance was unjustified allowed the court to further rule that Nu-Air acted unreasonably in not taking more appropriate measures to protect itself. These two rulings, if allowed to stand, would severely compromise Nu-Air's cause of action. Under Florida law, an insured's failure to mitigate damages may operate as a waiver and estoppel against the right to assert claims arising from the broker-client relationship. Keller Indus. v. Bellefonte Ins. Co., 412 So.2d 899 (Fla.Dist.Ct.App.1982) (quoting Burns v. Consolidated Am. Ins. Co., 359 So.2d 1203, 1206 (Fla.Dist.Ct.App.1978)). Nu-Air's negligent misrepresentation claim would also fail because justifiable reliance is a key element of that tort. See, e.g., Bruce v. American Dev. Corp., 408 So.2d 857 (Fla.Dist.Ct.App.1982)
 The lower court advances an additional reason why Nu-Air acted unreasonably. Apparently, the lower court concluded that Nu-Air should have purchased pre-shipment insurance to protect itself against the risk that FCIA would wrongly repudiate the post-shipment insurance before the goods were actually shipped. This is error. Nu-Air had the right to assume that its insurer would act in good faith.
 
 
 [32]
 The parties dispute how much of this technical information Intercredit passed on to Nu-Air
 
 
 [33]
 See supra note 28