## SEATTLE FUR EXCHANGE, INC., a Washington corporation, Plaintiff–Appellant,

v.

## FOREIGN CREDIT INSURANCE ASSOCIATION, and its member companies: American Credit Indemnity Co. of New York; Hartford Accident & Indemnity Company; Liberty Mutual Insurance Company; The Travelers Indemnity Company; U.S. Export/Import Bank; and First Interstate Bank of Oregon, N.A., a National banking association, Defendants–Appellees.

No. 91–36171.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 8, 1993.

Decided Oct. 8, 1993.

ments for the same injury.

John S. Riper, Stanislaw, Ashbaugh, Chism, Jacobson & Riper, Seattle, WA, for plaintiff-appellant.

Daniel E. Loeb, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, John D. Wilson, Jr., Wilson, Smith, Cochran & Dickerson, Seattle, WA, for defendants-appellees.

Before: BRUNETTI, LEAVY, and TROTT, Circuit Judges.

LEAVY, Circuit Judge:

The issue before us is whether there must be strict compliance with the terms and conditions of an insurance policy where a federal agency, the Export–Import Bank of the United States ("Eximbank"), has agreed to cover losses from exporting in the event of insolvency of a private insurer. We hold that under these circumstances, there must be strict compliance.

Seattle Fur Exchange ("Seattle Fur") conducts a fur exchange business in which it auctions and sells furs and pelts to wholesale buyers. In 1988, Seattle Fur obtained a "Short Term Comprehensive Multi–Buyer Export Credit Insurance Policy," No. CSD–65904 ("the policy"), from the Foreign Credit Insurance Association ("FCIA"), a consortium of private insurance companies,[1] and from Eximbank. The policy insured Seattle Fur against losses from foreign buyers who defaulted on their purchases.

In 1988 and 1989, a number of foreign buyers purchased furs and pelts from Seattle Fur. The claims at issue arose after eleven of the foreign buyers defaulted on their payments due to a worldwide decline in the demand for furs. Seattle Fur filed insurance claims, but FCIA denied them.

Seattle Fur brought this diversity action against FCIA, Eximbank, and the First Interstate Bank of Oregon. FCIA moved for summary judgment, contending that Seattle Fur had failed to comply with the policy terms and conditions. FCIA alleged:

> [A]s a matter of law, [FCIA] is entitled to the entry of a judgment determining that plaintiff is not entitled to recover on these insurance claims because plaintiff failed to respond to FCIA's requests for information and documents which, pursuant to its policy of insurance, [Seattle Fur] was obligated to provide *and*, more importantly, because [Seattle Fur] failed to comply with or breached material terms and conditions set forth in its policy of insurance and

---

1. At the times relevant to this action, FCIA consisted of the unincorporated association of the American Credit Indemnity Co. of New York, Hartford Accident and Indemnity Company, Liberty Mutual Insurance Company, and the Travelers Indemnity Company.

thereby failed to invoke coverage under the insurance policy.

The district court denied the motion. After extensive discovery, FCIA renewed its motion. This time, the court granted it. A final judgment was entered in favor of FCIA.[2] Seattle Fur appealed.

## DISCUSSION

### The Relationship Between Eximbank and FCIA

In 1945, to facilitate exports, Congress created Eximbank, "an independent agency of the United States." 12 U.S.C. § 635a(a). Eximbank is "authorized and empowered" to, among other things, "guarantee, insure, coinsure, and reinsure against political and credit risks of loss" "to aid in financing and to facilitate exports and imports ... between the United States ... and any foreign country." 12 U.S.C. § 635(a)(1) (1988). Congress authorized Eximbank to issue insurance in conjunction with private "insurance companies ... or groups thereof" and to employ them "as its agent in the issuance and servicing of such guarantees, insurance, coinsurance, and reinsurance, and the adjustment of claims arising thereunder." 12 U.S.C. § 635(c)(2). According to Joseph M. Piepul, Vice President and Assistant General Counsel of FCIA, FCIA was created in 1961 pursuant to 12 U.S.C. § 635(c)(2), "at the behest and with the encouragement of [Eximbank]." Piepul explains the history of FCIA's insurer role:

> Initially, FCIA, and its member companies, acted as insurers of, and were responsible for all the risk on so-called commercial risks of loss. Eximbank, in turn, insured and accepted all risks associated with political risks of loss....
>
> In the 29 years since FCIA was first established, many foreign markets have become increasingly unstable both politically and economically. As a result, members of FCIA became more and more reluctant to take part in the program under the constraints and premium rates established. To counteract defections from the

program, while at the same time maintaining rates at levels affordable to small exporters, Eximbank took on a greater share of the financial responsibility for and financial risks associated with the various programs.

Ultimately, in 1983, Eximbank assumed all liability for both political and commercial risks of loss insured through such insurance policies as the one issued to [Seattle Fur] in June 1988. Thus, although FCIA and its member companies are denominated as the insurer of commercial risks under the [Seattle Fur] policy, Eximbank, and not FCIA, is ultimately responsible for covering insured losses. Eximbank retains final authority to approve the issuance of insurance policies to particular insureds, to approve or deny claims submitted by insureds and to set the terms and conditions contained in the insurance policies.

Excerpt of Record at 22–24, paras. 5–7.

### Federal Law

■ We have held that federal law applies where an action was brought seeking compensation for a loss under a federal flood insurance policy. *Brazil v. Giuffrida,* 763 F.2d 1072, 1074–75 (9th Cir.1985). We quoted the Fifth Circuit's reasoning as to why federal law should apply:

> Since the flood insurance program is a child of Congress, conceived to achieve policies which are national in scope, and since the federal government participates extensively in the program both in a supervisory capacity and financially, it is clear that the interest in uniformity of decision present in this case mandates the application of federal law.

*Id.* at 1075 (quoting *West v. Harris,* 573 F.2d 873, 881 (5th Cir.1978), *cert. denied,* 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 635 (1979)). We further explained how federal law would apply:

> Bank of Oregon.

---

**2.** After the notice of appeal was filed, Seattle Fur settled with FCIA's co-defendant, First Interstate

In creating the [Flood Insurance] Program, Congress did not intend to abrogate standard insurance law principles. Thus, we hold that federal law controls the interpretation of the policy in issue, recognizing that neither the statutory nor decisional law of any particular state is controlling, but that we shall apply the traditional common-law technique of decision by drawing upon standard insurance law principles.

*Id.* (citations and quotations omitted).

■ Because the export insurance program, which includes FCIA by virtue of 12 U.S.C. § 635(c)(2), is also a "child of Congress, conceived to achieve policies which are national in scope, and since the federal government participates extensively in the program both in a supervisory capacity and financially," we apply federal law. Moreover, Article 11D.(4) in Seattle Fur's policy specifically requires that:

the construction, validity and performance of this policy shall be governed by and construed in accordance with applicable Federal law.

*Whether Federal Law Requires Application of The "Strict Compliance" Requirement*

Seattle Fur argues that "[a]t the heart of this appeal is the District Court's decision to treat FCIA's member companies as if they were the Government, when they were actually acting as private insurance carriers." What is at issue for Seattle Fur is what federal law should be applicable to a group of private insurance carriers. Seattle Fur maintains that "the District Court erred in applying to private insurance companies an insurance law rule applicable only to federally-issued insurance[.]" The rule whose application Seattle Fur opposes requires "strict compliance" with the government's procedures and conditions imposed in its insurance programs.

The rule of strict compliance arose in *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). In *Merrill,* the Supreme Court held that when a wholly government-owned enterprise promulgated regulations governing conditions of insurance, those conditions must be met even though the enterprise accepted an application for insurance that did not meet a condition.[3] Seattle Fur argues that the insurance law applicable to government agencies should not apply to FCIA because FCIA member companies were "actually acting as private insurance carriers," "issued the policy in their capacity as private carriers," and "were not acting as a government agent for the issuance of the credit risk coverage."

There are decisions from other circuits holding that FCIA is not equivalent to a federal agency for purposes of applying the doctrines of estoppel, waiver, or immunity. *See NF Industries, Inc. v. Export–Import Bank of the United States,* 846 F.2d 998 (5th Cir.1988) (per curiam); *Nu–Air Mfg. Co. v. Frank B. Hall & Co. of New York,* 822 F.2d 987 (11th Cir.1987), *cert. denied,* 485 U.S. 976, 108 S.Ct. 1270, 99 L.Ed.2d 481 (1988); and *Lovell Mfg. v. Export–Import Bank of the United States,* 777 F.2d 894, 901 (3d Cir.1985). However, the insurance policy issued to Seattle Fur differs in a material way from the policies at issue in *NF Industries, Nu–Air,* and *Lovell* because Eximbank rewrote its policies as a direct response to those decisions.

In *NF Industries,* FCIA asserted official immunity as a defense to a claim of a breach of contract and various tort claims. The action arose when Eximbank denied a claim for coverage where the appellant, who had obtained a credit risk policy through FCIA, followed the FCIA's faulty advice on how to handle wartime currency transactions in Argentina after the outbreak of war in the Falkland Islands. *NF Industries,* 846 F.2d at 999. The Fifth Circuit declined to extend

---

**3.** In *Merrill,* the Federal Crop Insurance Corporation, a government corporation, issued regulations specifying the conditions under which it would insure wheat crops. One of the regulations made "spring wheat which has been reseeded on winter wheat acreage" ineligible for insurance. Without knowledge of this requirement, a wheat grower applied for and was ac-

cepted for insurance by an agent of the Corporation for a wheat crop that had been reseeded on winter wheat acreage. The Corporation was held not liable for the loss on the reseeded acreage despite the fact that a private insurance company would have been bound by the representations of its agent. 332 U.S. at 383–84, 68 S.Ct. at 2–3.

absolute governmental immunity to FCIA because:

> FCIA has failed to establish to our present satisfaction that it was serving a governmental function, or making the kind of decision that is protected by absolute official immunity. The reason for such immunity is not to shield wrongdoers from liability, but to safeguard the public's interest in having government officials free to make discretionary, policymaking decisions without threat of being sued, put to trial, and possibly held liable in their non-official capacities for those decisions. FCIA has not made, at this point, a substantial showing that it was exercising such a role.
>
> It appears that the participation of FCIA and its associated companies in the transactions at issue was both voluntary and proprietary. Governmental functions, generally, are neither. The companies decided whose risks to accept, and whose to decline, and with what policy dollar limits, all with a view to maximizing profits. FCIA has not demonstrated to us that it was performing any governmental function or making any discretionary (i.e., policymaking) governmental decisions.

*Id.* at 1000 (citations omitted).

In *Nu–Air*, FCIA denied that certain coverage was ever in effect when an appellant claimed FCIA's agent had represented that its shipment to Nigeria was insured. 822 F.2d at 989. The appellant contended that waiver and estoppel should apply to FCIA. FCIA responded that it "stands above these general principles of waiver and estoppel because it issues insurance on behalf of a United States government agency, [Eximbank].... [A] failure to strictly comply with policy provisions bars recovery whenever the insurer acts as an agent of the United States government." *Id.* at 994.

The Eleventh Circuit rejected FCIA's argument. It concluded that the policy was "a private contractual arrangement[ ] between private litigants." The circuit held that FCIA was the sole insurer: "[t]hough FCIA may recoup its losses under a separate agreement between FCIA and Eximbank, Nu–Air is not a party to that arrangement." *Id.* The court distinguished *Merrill* because,

unlike the wheat farmer there, "Nu–Air's claim is not directed toward the public treasury[;] '[r]ather, it is FCIA's potential claim against the government under the reinsurance agreements, and not [the insured's], which is directed toward the public fisc[.]'" *Id.* (quoting *Lovell Mfg. v. Export–Import Bank of United States*, 777 F.2d 894, 901 (3d Cir.1985)). For these reasons, the Eleventh Circuit concluded that the traditional concepts of waiver and estoppel applied against FCIA. *Id.* at 995.

The most important of the three cases is *Lovell.* In deciding *Lovell,* the Third Circuit made some observations about the relationship between Eximbank and FCIA, and the way policies were worded at that time, that led the Third Circuit to conclude that FCIA should not be entitled to the more stringent estoppel criteria applicable to government agencies.

In *Lovell,* a manufacturing company ("Lovell") obtained policies that included special increased coverage for political and commercial credit risks for its sales to a Venezuelan subsidiary company. At first, FCIA denied Lovell's application for extra coverage but later approved it when a letter guaranteeing payment arrived from the parent company. In reliance on the representation that increased coverage had been obtained, Lovell extended extra credit to the Venezuelan company. The Venezuelan company defaulted.

Lovell submitted notice of claims and proof of losses forms to FCIA. However, the claims did not contain any evidence that Lovell had complied with the guarantee requirement of the policy. When the parent company's guarantee letter was presented again, it was found to be deficient under Venezuelan law. The claims were denied on the basis of the failure to comply with the policy condition. *Lovell,* 777 F.2d at 897.

Lovell sued. Both FCIA and Eximbank moved for summary judgment. Lovell asserted estoppel as a basis for recovery since FCIA required and accepted the parent company's guarantee letter when it first issued the policy for increased coverage.

According to the express terms of the policies, FCIA was the sole insurer with respect

to commercial credit risks and Eximbank was the sole insurer with respect to political risks. However, the district court granted summary judgment for FCIA, holding that it was acting as a government agent of Eximbank and therefore, the higher standards for establishing estoppel against the government were applicable. *Id.* The Third Circuit disagreed. It concluded that FCIA was not acting as the government agent of Eximbank with respect to the commercial credit risk because: (1) by the very terms of the 1977 reinsurance agreement between Eximbank and FCIA, FCIA was "the sole insurer of commercial credit risks," *id.* at 900; and (2) even though a new reinsurance agreement in 1983 between Eximbank and FCIA made Eximbank responsible for paying FCIA's net losses in any given year that exceeded FCIA's net premiums, the public fisc was not at risk since FCIA did not commit Eximbank in the policies issued to Lovell; rather, it remained the sole insurer by the express terms of the policy. *Id.* at 900–901. The Third Circuit reasoned:

> The reinsurance agreements only run between Eximbank and FCIA. The fact that FCIA must now look to Eximbank for recoupment on Lovell's claim, pursuant to an entirely separate agreement to which Lovell was not a party, does not affect the duties owed to Lovell by FCIA under the insurance policies it issued. The obligation to Lovell resides with FCIA and not with Eximbank. Moreover, it is FCIA's potential claim against the government under the reinsurance agreements, and not Lovell's, which is directed toward the public fisc; this is not the case before us.

*Id.* at 901. Consequently, the Third Circuit held that traditional equitable estoppel principles applied against FCIA. *Id.*

Unlike the situation in *Lovell*, the policy with Seattle Fur specifically identifies Eximbank as the reinsurer in Article 11J of the policy:

> In the event of the insolvency of any [FCIA member] company, Eximbank agrees to pay to the *insured* the amount of the reinsurance applicable to the *loss* which would have been payable to the company, but for its insolvency.

According to FCIA, this addition to the policy was made in response to the decisions in *NF Industries, Nu–Air,* and *Lovell,* so as to provide a direct contractual link between Eximbank and the insured. If one or more of FCIA's members should become insolvent, the clause protects the other members from bearing the loss of the insolvent's proportionate share. Instead, the insured's recourse is directly against Eximbank, a federal agency. The public fisc is at risk since Eximbank directly owes the insured a duty. Thus, there is reason to apply the rule of "strict compliance." We therefore hold that Seattle Fur must strictly comply with all the contract terms and conditions to recover its losses under the policy. Because the overwhelming evidence shows that Seattle Fur did not comply with the policy requirements, summary judgment in favor of FCIA was proper.[4]

We need not decide whether FCIA must show prejudice before it may deny Seattle Fur's claims.

AFFIRMED.

4. The district court granted summary judgment to FCIA, stating:

> The FCIA based its denial of ten of [Seattle Fur's] claims on [Seattle Fur's] failure to satisfy at least one of three conditions in the Policy:
>
> 1. Failure to submit complete accurate and timely claims. Art. 9.A.(2);
>
> 2. Failure to provide the documents required to evidence buyer creditworthiness. Discretionary Credit Limit Endorsement;
>
> 3. Failure to obtain written buyer obligations. Art. 4.C.(1).
>
> All of the denied claims were incomplete, and all of them lacked either the buyer creditwor-

thiness documents, or the written buyer obligations. There is no dispute between the parties that [Seattle Fur] failed to file the necessary documentation within the time specified in the Policy, and so [Seattle Fur] failed to comply with the terms and conditions of the Policy for these ten claims.

Excerpt of Record at 145 (footnote omitted). For the remaining claim, the court explained that Seattle Fur had not complied with the policy terms and conditions in that it failed to report a shipment or to pay premiums on the shipment within thirty days of that shipment, as required by Art. 6.K., Art. 7.A, and Declaration 10.